1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
2

3    UNITED STATES OF AMERICA, et al,    )
                                         )
4               Plaintiffs              )
                                         )
5          -VS-                          )  CA No. 16-11372-PBS
                                         )  Pages 1 - 79
6    JAMES F. ALLEN, et al,             )
                                         )
7               Defendants             )

8

9                       **MOTION HEARING**

10          BEFORE THE HONORABLE PATTI B. SARIS
              UNITED STATES CHIEF DISTRICT JUDGE

11

12

13

14

15                           United States District Court
                             1 Courthouse Way, Courtroom 19
16                           Boston, Massachusetts  02210
                             May 1, 2018, 10:09 a.m.
17

18

19

20

21

22               LEE A. MARZILLI
              OFFICIAL COURT REPORTER
23         United States District Court
            1 Courthouse Way, Room 7200
24             Boston, MA  02210
                (617)345-6787
25

1    A P P E A R A N C E S:

2        JACQUELYN A. McETTRICK, ESQ., ANDREW H. DeNINNO, ESQ.,
     and NATHAN A. TILDEN, ESQ., Smith & Brink, P.C.,
3    150 Granite Street, Suite 2303, Braintree, Massachusetts,
     02184, for the Plaintiffs.

4

5        ANDREW A. KASSOF, ESQ., Kirkland & Ellis LLP,
     100 North LaSalle, Chicago, Illinois, 60654, for the Defendant,
     Alere Home Monitoring, Inc.

6

7        MARK W. PEARLSTEIN, ESQ., McDermott Will & Emery,
     28 State Street, Boston, Massachusetts, 02109,
     for the Defendant, Roche Health Solutions, Inc.

8

9        KARA G. THORVALDSEN, ESQ., Wilson Elser Moskowitz Edelman
     & Dicker, LLP, 260 Franklin Street, 14th Floor, Boston,
     Massachusetts, 02110-3112, for the Defendants, US Healthcare
10   Supply, LLC, and Advanced Cardio Services.

11       DANIEL J. GELB, ESQ., Gelb & Gelb LLP,
     900 Cummings Center, Suite 207 V, Beverly, Massachusetts,
12   01915, for the Defendant, CardioLink Corp.

13       SARA JANE SHANAHAN, ESQ., Sherin and Lodgen LLP,
     101 Federal Street, Boston, Massachusetts, 02110,
14   for the Defendant, Patient Home Monitoring.

15       LAWRENCE M. KRAUS, ESQ., Foley & Lardner LLP,
     111 Huntington Avenue, Boston, Massachusetts, 02199,
16   for the Defendant mdINR, LLC.

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

THE CLERK:  Court calls Civil Action 16-11372, United States v. Alere Home, et al.  Could counsel please identify themselves.

MR. DeNINNO:  Good morning, your Honor.  Andrew DeNinno on behalf of the plaintiff relator.

MS. McETTRICK:  Good morning, your Honor.  Jacquelyn McEttrick on behalf of the plaintiff.

MR. KRAUS:  Good morning.  Lawrence Kraus for mdINR.

MR. KASSOF:  Good morning, your Honor.  Andrew Kassof for Alere Home Monitoring.

MR. PEARLSTEIN:  Good morning, your Honor.  Mark Perlstein for Roche.

MR. GELB:  Good morning, your Honor.  Richard Gelb for CardioLink.

MS. SHANAHAN:  Good morning, your Honor.  Sara Shanahan for Patient Home Monitoring.

MS. THORVALDSEN:  Good morning, your Honor.  Kara Thorvaldsen for US Healthcare Supply and Advanced Cardio Services.

THE COURT:  All right, thank you.  You may be seated. Have you worked out among yourselves an order?

MR. PEARLSTEIN:  Yes, your Honor.  So I will be going first on behalf of Roche, and then it will be Alere, mdINR, and then that's number four.

1       MS. SHANAHAN:  Patient Home Monitoring, your Honor.

2       MR. GELB:  I guess we're going last, your Honor.

3       THE COURT:  And so how long do you each need because I

4  need to make sure I have enough time for everybody because I

5  need to give plaintiffs fair time, and you may want a brief

6  rebuttal?

7       MR. PEARLSTEIN:  So mine may be longer than some, but

8  I'm going to do it in 20 minutes or less.

9       THE COURT:  If you do it by 10:30 -- we just need to

10  script this out -- let's say each one of you gets ten minutes

11  and then you get the remainder of the time, does that make

12  sense from your point of view?

13       MR. DeNINNO:  Your Honor, I'm not sure I follow the

14  remainder.

15       THE COURT:  So it sounds as if 10:30, we'd be done

16  with the rest by 11:30, and you'd get at least a half an hour.

17       MR. DeNINNO:  To respond to all seven of the

18  defendants?

19       THE COURT:  Or do you think it makes sense -- that's

20  why I'm asking you -- to get going?  Would you rather respond

21  person by person?

22       MR. DeNINNO:  I think it might make sense to do it

23  that way, your Honor.

24       THE COURT:  My concern about that is, just saying, we

25  may not get through everyone, so that's why I'm trying to in

1    advance.  I'm happy to go that way, but let's say 20 and -- I

2    won't have time.  I'm hoping we're not going to hear the same

3    thing from each one.  How do you want to handle it?  Would you

4    prefer to go after each one?

5         MR. DeNINNO:  My preference would be to go after each

6    one.  I don't think we'll need a full 20 minutes to respond to

7    Roche, and I certainly think that as we progress, that a lot of

8    the same issues will repeat themselves.

9         THE COURT:  I do think that they will.  All right, so

10   why don't we take Roche first, and then we'll keep going.  And

11   there's nothing earth-shatteringly urgent about this.  If I

12   don't finish everybody, I'll schedule another time for the

13   remaining two.  I have to be out of here by 1:00 o'clock, and I

14   think we should be able to finish it in that time frame.

15        MR. DeNINNO:  Thank you, your Honor.

16        MR. PEARLSTEIN:  Thank you, your Honor.  The theory

17   that's being advanced here by the relator is essentially an

18   attack on Roche's decision to limit the frequency that it will

19   support for its testing service for patients who are on

20   Warfarin.  It's simply not actionable, and there really are

21   three core reasons for that, your Honor.  One, the patient

22   order form -- and there are different versions, but the

23   earliest one is attached as Exhibit F to the amended

24   complaint -- is clear and transparent, and unlike cases we'll

25   talk about a little bit later, no physician has allegedly been

1    misled by that order form.  The choices that it provides are

2    clear.

3         Secondly, federal law unambiguously allows providers

4    to determine what services they will provide, and nothing about

5    the theory advanced here alters or in any way should modify

6    that.

7         And, third, the whole notion of coercion in this case

8    is simply implausible.  As the materials that the relator has

9    submitted demonstrate, home testing, the testing that's at

10   issue here, represents a tiny segment of the market for testing

11   services available to Warfarin patients.  In that circumstance,

12   where so many other options are available to physicians and

13   their patients, including the relator in this case, the notion

14   that limiting this one narrow segment of the market, limiting

15   it in terms of the services offered is in any way coercive is

16   simply implausible, and saying it does not make it actionable.

17        Let me just sketch out a few background facts.  I

18   don't think you're going to hear these from anybody else, your

19   Honor.  So Warfarin is an anticoagulant.  It is prescribed to

20   inhibit clotting.  There are three conditions for which

21   Medicare patients can receive -- well, so testing needs to take

22   place for Warfarin, and the reason for that is, Warfarin is an

23   anticlotting agent, but if there's too much Warfarin, it can

24   result in uncontrolled bleeding.  So there's a risk of stroke

25   if it's at too low a level, and there's a risk of uncontrolled

1  bleeding if it's at too high a level.

2       Medicare allows reimbursement for patients who test

3  for three conditions:  those with a mechanical heart valve,

4  those with atrial fibrillation, those with deep vein

5  thrombosis.  In 2006 FDA issued a black box warning which urged

6  physicians to regularly test patients who are on Warfarin for

7  just this reason; and there are a range of views among

8  physicians about the appropriate testing frequency, when

9  patients are to be regarded as stable, and therefore able to be

10 maintained on a lower frequency.

11      The test settings, your Honor, include home, but, as

12 we said, home testing represents a tiny slice of the market.

13 The 2008 CMS decision that expanded reimbursement says

14 5 percent.  The Heneghan article from 2012 cited by relator

15 said that only 1 percent of patients are testing at home.  This

16 particular percentage is not especially important.  The key is

17 that it is a distinct minority of patients who test at home.

18 Most test in hospitals, in physicians' offices, or special

19 anticoagulation clinics that are set up to provide this kind of

20 testing.  And indeed the relator, Mr. Allen, did just that.

21 According to his complaint, he tested at a VA hospital, he

22 tested at his physician's office in Buffalo, and then after he

23 moved to Canandaigua, New York, about 100 miles away, he tested

24 at a local hospital there.  So he along with other patients has

25 multiple options available in addition to home testing.

1          Reimbursement for home testing, your Honor, it's sort

2    of an unusual system.  If a patient enrolls, the patient will

3    receive a testing meter and strips.  There is no charge for the

4    provision of the meter and the strips.  Every four tests are

5    grouped together in a billing unit under a code.  It's G249.

6    And the notion is that through the reimbursement for the

7    testing, the companies that are providing this service will

8    ultimately recover the cost of the meter and the strips.

9    Medicare recognizes that up to weekly testing can be an

10   appropriate frequency for patients because Medicare authorizes

11   reimbursement for patients at that frequency.

12          As to the relator, Mr. Allen, who is the only

13   patient --

14          THE COURT:  Does Medicare ever say it's unnecessary to

15   do it once the Warfarin has been testing appropriately for a

16   period of time?

17          MR. PEARLSTEIN:  It doesn't.  It simply states once

18   per week, and while I don't think --

19          THE COURT:  It doesn't ever say "but it's unnecessary

20   in a lot of patients"?

21          MR. PEARLSTEIN:  So that's a determination that

22   physicians make --

23          THE COURT:  I understand, but does Medicare have

24   guidelines on point?

25          MR. PEARLSTEIN:  It does not.  It simply -- what

1    Medicare does is authorize as frequently as once per week.  It

2    does not provide any guidance that says "but walk that back if

3    X, Y or Z happens."  It leaves it to the physician's judgment.

4    And, again, I think it's fair to say -- and we see it in the

5    studies that have been referenced in the papers, and you even

6    see it in Dr. Riegel's care of Mr. Allen -- physicians have

7    different views about how to manage their patients.

8         THE COURT:  There's an argument that one of those

9    studies, the 2012, is misleading, or, more accurately, that

10   there's more recent information that makes that misleading to

11   rely on.

12        MR. PEARLSTEIN:  So it's actually the other way

13   around.

14        THE COURT:  Is it the other way around?  All right.

15        MR. PEARLSTEIN:  The 2006 Heneghan study is alleged to

16   have been misleading.  The 2012 study which relator points to

17   actually doesn't support that.  As we lay out in our brief, it

18   specifically does not say, as they allege, that the earlier

19   study was disclaimed or is to be abandoned.  What they said is

20   that the 2012 study supplements, it provides additional

21   information about home monitoring.  And the other point is, it

22   wasn't a repudiation of any --

23        THE COURT:  Excuse me.  That Heneghan study, where is

24   that?  Is that on your website?

25        MR. PEARLSTEIN:  No.  So that's a good question

1  because there is an allusion in the -- several allusions in the

2  complaint to unspecified marketing material that had reference

3  to the Heneghan study.

4          THE COURT:  The 2006 one?

5          MR. PEARLSTEIN:  The 2006 study, that's correct.  But

6  it's not identified as to what that material was, to whom it

7  was circulated, or whether even a single physician was

8  influenced by it, or whether even one claim resulted from, you

9  know, the unknown physician having been so influenced, and

10 there's just not much information about it.

11         THE COURT:  Well, is it on your website?

12         MR. PEARLSTEIN:  I don't know the answer to that.

13         THE COURT:  All right.

14         MR. PEARLSTEIN:  So --

15         THE COURT:  It's not alleged that it's on your

16 website?

17         MR. PEARLSTEIN:  It's not alleged as such, that's

18 right.

19         So Mr. Allen began testing with Roche in March, 2014,

20 and it's a fairly simple story.

21         THE COURT:  I actually -- just to make sure we move a

22 little more quickly, I read all of this, so I understand the

23 situation with Mr. Allen and Roche and the doctor.

24         MR. PEARLSTEIN:  Okay, all right, so then let me hit

25 the legal argument.

1           THE COURT:  Yes.

2           MR. PEARLSTEIN:  So the physician order form, your

3    Honor, unlike the order forms in other of the cases that have

4    been cited to you, is absolutely clear and transparent.  This

5    is not an instance where physicians were deceived into ordering

6    tests that they had not intended to order.  It provided a clear

7    frequency.  And in fact the only physician who is referenced in

8    the complaint, or the only physicians are physicians who

9    treated Mr. Allen, do not claim to have been misled by the

10   choices.  The choices that Roche provided were once a week,

11   twice a month, or two to four times a month.  There's no

12   ambiguity about that and no claim that they were at all

13   deceived.  There's no --

14          THE COURT:  So is there a place to put in once a

15   month?

16          MR. PEARLSTEIN:  So there used to be because Roche did

17   support once a month prior to this time.  And in July, 2014,

18   Dr. Riegel attempted to change the order.  He said, "I had

19   ordered two to four a month, and now I think once a month is

20   appropriate," and Roche responded to that by saying, "We don't

21   support that."

22          THE COURT:  Well, where did he write that?  I mean, is

23   there a place on the form to say "other" or --

24          MR. PEARLSTEIN:  There was a place on the form for

25   "other," and Roche, having changed its policy to no longer

1   support once a month, eliminated the "other" option.  But he

2   tried it.  Roche said "no," and Roche gave Mr. Allen until the

3   end of September, 2014, to find other testing.  And there's no

4   allegation that any of the tests that were provided by Roche

5   were medically unnecessary.  They were all pursuant to the

6   order form signed by Dr. Riegel.

7          Now, what relator says is -- and you see this in the

8   affidavit of Dr. Riegel -- that he felt pressured, that he

9   wanted this as an option for at least certain of his patients,

10  and that's why he signed an order form saying two to four times

11  a month.  The problem with that from a False Claims Act

12  perspective is that Roche was absolutely entitled to rely upon

13  the physician's order, and the only reason that Roche would not

14  have been entitled to rely upon that order is if it had

15  information that contradicted the order, that indicated that in

16  fact it wasn't --

17         THE COURT:  Or there was something misleading on the

18  form.

19         MR. PEARLSTEIN:  Well, so if there's something

20  misleading on the form; but if you look at the other examples,

21  the second *Boston Heart* decision that Judge Walton decided in

22  December, 2017, the *Berkeley Health* case, even the OIG guidance

23  makes it clear that the lab that's conducting the test isn't in

24  a position to assess medical necessity.

25         THE COURT:  You know, I read that opinion.  I thought

1   it was really helpful, except then there's the final tag,

2   "unless there's something misleading that was provided to the

3   doctor," and I agree with both of those statements.

4         MR. PEARLSTEIN:  I agree with those statements too.

5         THE COURT:  So you can rely on a doctor's prescription

6   or order --

7         MR. PEARLSTEIN:  That's right.

8         THE COURT:  -- unless the doctor was improperly

9   induced by either false statements or a kickback or some such.

10        MR. PEARLSTEIN:  That's right, but that's not this

11  case, and there's no evidence of that.

12        THE COURT:  Well, there is some allegations on some of

13  the other forms that there was something misleading.

14        MR. PEARLSTEIN:  But not that Dr. Riegel was misled,

15  and he's the single physician in this case.  There's no

16  evidence whatsoever that he was misled.  And in fact, to come

17  back to the *Boston Heart* case, Mr. Allen tried to fit himself

18  into the construct that Judge Walton ultimately described when

19  he contacted Roche and said, "I'm willing to test twice a month

20  even though it's not medically necessary."  So in that

21  circumstance, you have a prescription for twice a month and

22  evidence that it's not medically necessary.  And Roche's

23  response was, "No, we are not going to do that."  So Roche was

24  entitled to rely upon it.  There was simply no falsity here

25  because every claim was medically necessary, your Honor.

1          The lab cases that have been cited to you are each

2     readily distinguishable.  We talked about *Boston Heart*.  In the

3     *Bane* case, the test form itself was misleading.  It wasn't

4     clear, it wasn't transparent, and it deceived doctors, at least

5     at the 12(b)(6) stage.  *Family Medical Centers* was a bundling

6     together of medically unnecessary/necessary tests and standing

7     orders that required tests, even if there was no actual

8     physician order.  The *Downy* case, the same thing about

9     bundling, and physicians were allegedly misled into believing

10    that these two combined tests both needed to be performed at

11    the same time.

12          The key here is, it's just as you said:  It's either

13    that the physician's judgment was corrupted through a kickback

14    or improper inducement, or the physician was deceived or

15    misled.  There's no allegations of that in this case.

16          Now, the relator claims doctors were coerced by this

17    choice, and I touched on this earlier.  It is implausible.

18    It's not as if home testing represents a majority of the market

19    or is the sole option.  Indeed, it is the smallest of the

20    options, and, as Mr. Allen's experience demonstrates, he was

21    able to test in other settings notwithstanding the Roche

22    policy.

23          THE COURT:  Well, it does put doctors in a bind,

24    though, because suppose you have someone who's highly frail or

25    elderly or lives a really far distance away and doesn't

1   otherwise have a ride, it puts the doctor in the catch-22.  He

2   orders four tests, or he assumes that the person is actually

3   not going to get tested once a month.

4          MR. PEARLSTEIN:  So there's two answers --

5          THE COURT:  I mean, maybe it's just a horrible

6   conundrum.  That's different from a False Claims Act violation,

7   but it does put pressure on the doctor.

8          MR. PEARLSTEIN:  So I guess three responses to that:

9   One, it's not a False Claims Act violation.  Two, the fact that

10  a patient is elderly and frail in a lot of instances means that

11  they're not well suited to conduct the home testing at all.

12  And, three, the physician's obligation to determine medical

13  necessity is not changed by that.  He or she still needs to

14  make a good-faith judgment about what is required for the

15  patient.

16         THE COURT:  So you're saying that the -- I understand

17  exactly what Dr. Riegel was saying.  I mean, the doctor feels

18  some pressure that for someone who doesn't have ready access to

19  a clinic, the choice may not be between four and one; it may be

20  between four and none.

21         MR. PEARLSTEIN:  But that's not even our case because

22  to take this example, and it's the only example we have in

23  front of us, Mr. Allen moved 90 to 100 miles away from

24  Dr. Riegel's clinic in Buffalo, but we know from Mr. Allen's

25  affidavit that he tested in his new hometown, Canandaigua, at

1    the local hospital.  So it is ultimately about convenience,

2    patient convenience, nothing more than that, and it's not

3    actionable under the False Claims Act.

4         THE COURT:  Well, it may be more than that.  I mean,

5    maybe not just convenience; it's the ability.  But, anyway,

6    that may not be a False Claims Act problem.  So we need to

7    finish this up.

8         MR. PEARLSTEIN:  All right, so let me just hit on two

9    other points.  One --

10        THE COURT:  Quickly, because then I need to get them,

11   and we have so many people who want their day.

12        MR. PEARLSTEIN:  So providers do not have an

13   obligation to provide any service that a doctor deems medically

14   necessary.  That's their contention.  Federal law is to the

15   contrary.

16        THE COURT:  Yes, I understand that.  Okay.

17        MR. PEARLSTEIN:  Okay.  And then I've touched on the

18   false statement piece already.

19        THE COURT:  Yes, because I'm going to ask them about

20   that because that is one of the ways of inducement is by -- I

21   mean, I had that in my *Neurontin* case where there was false and

22   I would say even fraudulent information being marketed directly

23   to the doctors, and that is one of the exceptions to this.  So

24   I'm going to find out exactly what you're alleging with respect

25   to Roche.

1        MR. DeNINNO:  Your Honor, I am going to get into just

2   briefly our theory of the case.  I would like to respond to --

3        THE COURT:  That's fair, because that could be like an

4   umbrella for all of them.  Fair enough.

5        MR. DeNINNO:  I would like to respond to at least one

6   of the specific contentions made by Roche, which is that

7   coercion is implausible as alleged by the amended complaint.

8   In fact the amended complaint, as you know, includes an

9   affidavit from Dr. Riegel.  And Dr. Riegel specifically

10  reported that in or about 2013, representatives called the

11  Buffalo Cardiology and Pulmonary Associates Coumadin Clinic to

12  inform them that all of the patients of the Coumadin Clinic

13  would have to start agreeing to test -- or the physicians would

14  have to agree that the patients would have to test at least

15  every two weeks, or else they would not be allowed to continue

16  participation in the Roche program.

17       What Roche didn't say is that "We're no longer going

18  to provide services to the patients who are testing monthly."

19  They told the doctors that "You have to switch the patients

20  over to testing every two weeks."  So this isn't a situation

21  where Roche decided to stop offering services to patients who

22  required monthly testing.  Instead, Roche called the physicians

23  and attempted to make them change all of the patients over.

24  And in Mr. Allen's specific case, Roche was aware that Buffalo

25  Cardiology had previously ordered INR testing pursuant to the

1    independent physician judgment, which we also explain in the

2    complaint and in Dr. Riegel's affidavit is based on an

3    algorithm physicians at Buffalo Cardiology developed.  That

4    algorithm required testing to be performed based on the

5    previous result, so --

6        THE COURT:  At the end of the day, the problem I have

7    with this is, Dr. Riegel didn't sign off, and they stopped.  So

8    there's that -- you wrote 50 pages on this topic, but pretty

9    much I've got to have a false claim.  You know, I get it

10   that -- I don't have any false claim with respect to Roche.

11       MR. DeNINNO:  Well, the initial prescription that

12   Roche had Dr. Riegel sign, which was because of the limited

13   options for two to four tests per month, when Roche was aware

14   that Dr. Riegel would have prescribed testing pursuant to the

15   algorithm, that led to actual submissions by Roche before the

16   dispute arose about whether or not Mr. Allen, when he received

17   the letter from Roche telling him that he had missed a test and

18   that's what led to this whole --

19       THE COURT:  There were no false claims put in, right?

20       MR. DeNINNO:  Your Honor, we allege that there are

21   because Roche --

22       THE COURT:  So you're talking about the one false

23   claim before they stopped?

24       MR. DeNINNO:  That was the only actual claim that

25   Roche knew, but that also leads me into the theory of the case

1    overall, which is that every time the defendants, including

2    Roche, had a doctor sign one of these enrollment forms, and

3    really even before they signed the enrollment form, by

4    instituting this policy where they determine the test

5    frequency, they necessarily violated regulations that were

6    express conditions of payment.  The home INR testing is covered

7    by Medicare pursuant to a national coverage determination.

8    That national coverage determination specifically says that

9    every test must comply with -- it's 42 CFR 410.32(a), which

10   says that tests not ordered by the physician who's treating the

11   beneficiary are not reasonable and necessary.  They're also

12   bound by --

13          THE COURT:  But the physician ordered it, or at least

14   when he didn't order it, they stopped, and when they do order

15   it, they go.  And that Reggie Walton case -- I don't know if

16   you know what I'm talking about -- where he reconsidered --

17          MR. DeNINNO:  The *Boston Heart*.

18          THE COURT:  Yes, *Boston Heart*, I should call it that.

19   I know Judge Walton.  But basically the *Boston Heart* case says,

20   if the doctor orders it, unless the doctor is improperly

21   induced, that's the end of the story.

22          MR. DeNINNO:  Well, I think that case is particularly

23   on point with respect to Roche, at least as it relates to

24   Mr. Allen and other patients of the Buffalo Cardiology Clinic

25   because they contacted them and told them that they had to

1   switch their patients over.

2          THE COURT:  And they didn't do it.  At least there's

3   no proof that they did it.

4          MR. DeNINNO:  Well, they did it with respect to

5   Mr. Allen because Mr. Allen when he called in April of 2014 to

6   report what his test result was, Buffalo Cardiology told him

7   test again in a month, which was pursuant to their algorithm

8   because he had had several tests --

9          THE COURT:  Right, but then there were no claims put

10  in.

11         MR. DeNINNO:  Right, but all of the tests that were

12  performed previous to that were based on Roche's improper

13  mandate, and Dr. Riegel never signed an order based on his own

14  independent physician judgment.

15         THE COURT:  So just maybe I don't understand the

16  chronology well enough.  So Allen gets tested once a week,

17  right?  And then he says, "I don't need it once a week."  And

18  the doctor says, "He doesn't need it once a week," and then

19  they stopped.  Do I have this --

20         MR. DeNINNO:  After Allen contacted Roche and he then,

21  you know, realized that Roche was asking him to test in a

22  manner that Dr. Riegel had not intended or that Dr. Riegel

23  didn't believe was necessary, or wasn't pursuant to

24  Dr. Riegel's independent physician judgment, then Roche

25  informed him that they would no longer allow him to test.

1            THE COURT:  Right, so they didn't submit false claims.

2            MR. DeNINNO:  Your Honor, we still contend that the

3      claim that they submitted, even --

4            THE COURT:  Which claim, the first one?

5            MR. DeNINNO:  Yes.

6            THE COURT:  The very first one?

7            MR. DeNINNO:  Yes.

8            THE COURT:  Well, then the first one, you're entitled

9      to at least one test.  I mean, I --

10           MR. DeNINNO:  Well, they have to perform four tests

11     before they submit a claim, so each claim is the result of four

12     tests.

13           THE COURT:  So this case is about three claims?  You

14     could settle it tonight, even trebled.  I mean, it's just --

15           MR. DeNINNO:  I mean, it gets back to my point, your

16     Honor, which is that it's the underlying policy that they

17     admittedly applied to every single patient, and, you know, the

18     falsity is their failure to comply with the regulations.  And,

19     as I was saying, the very next regulation beyond the one that's

20     specifically incorporated in the coverage determination is the

21     regulation that applies to independent diagnostic testing

22     facilities, which is what Roche is; and that regulation says

23     that all procedures performed by the IDTF must be specifically

24     ordered in writing by the physician.  And this theory that if

25     they limit the options that physicians have and that is a valid

1 physician order, it reads out the entire -- you know, it reads

2 out the word "specifically" from the regulation entirely, and

3 the regulation --

4 THE COURT:  Why?  Why if it's ordered by a physician

5 as medically necessary and the physician isn't wrongfully

6 induced?  I get the --

7 MR. DeNINNO:  The physician has to be able to exercise

8 independent judgment.

9 THE COURT:  But they don't have to provide a service,

10 right?  I can't force them to provide a service that --

11 MR. DeNINNO:  No, I think they do have to provide a

12 service.

13 THE COURT:  I see.  So it's an affirmative obligation

14 to provide it once a month, if so desired by a doctor, even if

15 it doesn't cover their costs?  I'd be going a long way, wouldn't

16 I?

17 MR. DeNINNO:  Not to provide it once a month, your

18 Honor.  To provide it in accordance with physician

19 prescriptions.

20 THE COURT:  Well, fine, provide it once a month as

21 prescribed by a doctor, even if it loses money.

22 MR. DeNINNO:  Right.  But, your Honor, they wouldn't

23 be prevented in that situation, even assuming that they're

24 losing money at once a month, which I'm not sure there's any

25 reason to make that assumption based on the --

1          THE COURT:  He alleges it.  I don't know.

2          MR. DeNINNO:  That being said, they can contact

3    doctors, they can contact patients, they can use truthful

4    marketing to attempt to increase the amount of their sales.

5          THE COURT:  So when you say -- and that was the one

6    piece that I did want to ask you about -- untruthful marketing,

7    that is one of the exceptions to this rule.  So what are you

8    referring to?

9          MR. DeNINNO:  The complaint uses as an example that

10   Heneghan article.  The complaint alleges that there were

11   multiple citations to outdated articles, and then --

12         THE COURT:  Where?  Where?  That's what I'm trying to

13   understand.

14         MR. DeNINNO:  The complaint alleges that they're in

15   the defendant's marketing materials.  The allegations --

16         THE COURT:  Roche's marketing materials?

17         MR. DeNINNO:  As to Roche, the allegations are on

18   their website, which the complaint refers to marketing --

19   sorry?

20         THE COURT:  The allegation is that it's on Roche's

21   website?

22         MR. DeNINNO:  The allegation of the complaint is that

23   it's in the marketing materials.  The reality is that it's on

24   their website.

25         And with respect to, your Honor, that Heneghan article

1    that Roche cited --

2          THE COURT:  And you're saying on the website is the

3    2006, not the 2012, or is it both of them?

4          MR. DeNINNO:  There is only reference to the 2006

5    article.

6          THE COURT:  Now as we sit here?  Or are you

7    referring -- anyway --

8          MR. DeNINNO:  As of the time we filed the complaint.

9    I am not sure about currently, your Honor.  I can't say that.

10   But the 2012 article --

11         THE COURT:  Can I just say, you know, everyone is a

12   product of their experience.  I'm no different.  So when I had

13   the *Neurontin* case, what was happening is, Pfizer was going

14   door to door with salesmen handing them false information, and

15   there were big conventions paid for at which there were

16   presentations with false information to physicians, and there

17   were false consultancy agreements with physicians.  So I had an

18   extreme case, I grant you, but you have to connect the -- I've

19   studied this area of law -- somehow connect the false marketing

20   materials to the physician decision, and at least on here I

21   think what you're saying is, it was on the website?  Is that

22   the closest you get to the physician?

23         MR. DeNINNO:  Well, we also -- I mean, we have contact

24   from Roche to the Buffalo Cardiology Clinic, both to tell

25   patients to switch over, and later, after the dispute arose of

1    Mr. Allen, to try to mediate the dispute, for lack of a better

2    word, through the clinic.

3            THE COURT:  Okay, thank you.

4            MR. DeNINNO:  With respect, though -- let me just add,

5    with respect to that 2012 article, it appears that Roche and I

6    think maybe several of the other defendants take issue with the

7    word "disclaimed."  The actual article, the language of it were

8    that "The 2006 conclusions were limited by methodological

9    problems and inadequate reporting of important outcome data."

10   The defendants used the 2006 article because it claims that

11   there were reductions in incidences of stroke and hemorrhage

12   and the other adverse outcomes that can happen if the Warfarin

13   is not monitored correctly.  The conclusions that were limited

14   by methodological problems in the 2012 study were those adverse

15   outcomes.  They specifically found in the 2012 study that there

16   was no statistically significant reduction in the adverse

17   outcomes, except with regard to stroke in certain patient

18   populations, but overall they said that after reviewing the

19   data again, this isn't exactly what happened.  So I take issue

20   with the fact that the citation to the 2006 article to the

21   exclusion of the 2012 article is a valid statement by omission.

22           THE COURT:  Okay, thank you.  All right, so is that it

23   with Roche?

24           MR. DeNINNO:  One second, your Honor.

25           The only other thing that I would say with regard to

1     Roche is that this idea that they're entitled to rely on a

2     physician order form that they have limited the choices of the

3     physician, or they know that they're not giving the physician

4     the opportunity to make an independent medical determination, I

5     think means that that order form can't be a valid order.  These

6     regulations would have no meaning if it wasn't assumed that the

7     doctors will be making independent medical determinations.  And

8     the 410.33(d) specifically prohibits IDTFs from ordering tests

9     based on their internal protocols, which is exactly what's

10     happening here.  They're getting doctors to sign these orders

11     because the doctors, as Dr. Riegel explained, didn't have any

12     other choice with regard to some of their patients.  And in

13     Mr. Allen's case, it was because he lived far away, but your

14     Honor brought up another valid point, which is that patients

15     can live right next door.  If they're wheelchair-bound and they

16     don't have the assistance to get them to the clinic to do the

17     tests, then home monitoring is necessary; and in Mr. Allen's

18     case, Dr. Riegel made a decision that it was medically

19     necessary.

20          THE COURT:  Okay, thank you.

21          MR. DeNINNO:  Thank you, your Honor.

22          THE COURT:  Who's next?

23          MR. KASSOF:  I am, your Honor, Andrew Kassof.  I

24     actually put together some slides that might --

25          THE COURT:  Well, have you shown it to them?

1          MR. KASSOF:  I'm going to show it to them right now.

2          THE COURT:  That's always a little unfair.  You've

3     been sitting here this morning.

4          MR. KASSOF:  Well, and in fact I'm only going to use

5     some, your Honor, because I think some of it was covered.  I'm

6     going to do my best not to repeat anything that was said

7     previously.  May I approach, your Honor?

8          THE COURT:  Yes, but just know, if this case proceeds,

9     I don't understand why you didn't show it to them first thing

10    this morning.  This comes up all the time, and I think it's --

11    the last case I had, I ended up having to delay it for half an

12    hour for counsel to even be able to read it.

13         MR. DeNINNO:  Your Honor, we'll make an objection for

14    the record to not having an opportunity to read this beforehand.

15         THE COURT:  Well, do you want to wait?  In other

16    words, I don't want it if there's something brand-new in there.

17         MR. KASSOF:  There's nothing brand-new, but --

18         THE COURT:  Let me put it this way.  This is how I

19    handled the last one:  If there's something you've not seen

20    before, a document or an argument, you pop up and say, "I move

21    to strike," and I will strike it.

22         MR. KASSOF:  Thank you, your Honor.  Understood.  My

23    apologies.

24         THE COURT:  No, I understand, but you wouldn't like

25    someone to do it to you, right?  I mean, just it's sort of like

1    the Golden Rule:  If you don't want someone to do it to you,

2    don't do it to someone else.  You'd probably be very upset if

3    they came in with a stack against Alere that you didn't have

4    time to think about.

5         MR. KASSOF:  Well, my only response is, typically I

6    would have done this last night.  I take what your Honor is

7    saying, and I'll definitely --

8         THE COURT:  Okay, fine.  Yes, it happens all the time.

9    It's become my new pet peeve when I'm on panels, so --

10        MR. KASSOF:  Well taken, your Honor.

11        THE COURT:  All right.

12        MR. KASSOF:  The experience Mr. Allen had with Alere

13   is a little bit different than with Roche, but the false claims

14   are no more viable, and that's where I'm going to focus

15   entirely on the allegations and experiences with Alere and try

16   not to repeat at all the prior arguments, to the extent I can.

17        There are four key undisputed allegations, undisputed

18   facts, because they're supported in the complaint with an

19   affidavit by Dr. Riegel and by Mr. Allen, and that is that

20   Mr. Allen had and used other testing options.  Counsel for

21   Roche went through those a lot.  I'm just going to focus

22   towards the tail end right before Mr. Allen went to Alere.

23        Mr. Allen knew Alere's requirements in advance and

24   asked his doctor to enroll him anyway into the Alere program.

25   Mr. Allen's doctor certified to the medical necessity of two to

1    four times per week in an enrollment form submitted to Alere,

2    and then Alere followed Dr. Riegel's prescription.

3         Your Honor, on Slide 2 I walk through a timeline.  All

4    of this is taken straight from the complaint and the

5    affidavits.  It's been hit extensively previously, so I don't

6    need to walk through it all.

7         Once Mr. Allen moved to Canandaigua, he had already

8    had experience testing at a hospital, a VA hospital, and at

9    Dr. Riegel's clinic.  During that period of time, Mr. Allen

10   alleges that at times the amount of testing frequency had to

11   change because he changed to a vegetarian diet for one period

12   of time, and his medication was changed for another period of

13   time, and he tested more frequently.  Then he became, he said,

14   more stable.  He moved to Canandaigua, and he wanted at-home

15   testing with Roche.

16        I think the contrast between what happened with Roche

17   and Alere further explains why we don't believe this is a False

18   Claims Act case, and I'll get into that in a second, but what's

19   pretty important from our perspective, your Honor, is that just

20   before Mr. Allen tested at Alere, he was testing at the

21   F.F. Thompson Hospital, which was five and a half miles from

22   his home.  And on Slide 3, this is how he reached out to Alere.

23   On January 7 -- this is Exhibit K to the Allen affidavit --

24   Mr. Allen wrote to Alere, and he explained that he just had

25   moved from Buffalo to Canandaigua, so he's now 100 miles from

1    the old clinic that he attended with his doctor.  And he said

2    that it was very difficult to make that trip, so he was now

3    testing at the F.F. Thompson Hospital here in Canandaigua.

4    "They do not do the finger stick, so I have to give blood from

5    my arm.  We need help in getting into a home testing program."

6            And that, to me, explains why Mr. Allen wanted to

7    choose.  It's not because it was a matter of convenience.  He

8    preferred the home finger stick method.  When they're testing

9    at home, your Honor, they prick the finger, and they put it on

10   a strip and it goes into the meter, as opposed to at the

11   hospital where the blood is drawn intravenously.  Mr. Allen

12   explained to Alere that he didn't like having the blood drawn

13   intravenously, he preferred the finger stick, so he wanted to

14   get into a home testing program.  That was the reason he told

15   Alere.

16           Alere wrote back two days later -- this is Exhibit L

17   to the Allen affidavit -- and said that "Our program requires

18   that you test at least two times a month.  Although some

19   physicians do require home testers to test weekly, that will be

20   up to your physician."  So they laid out their program, and

21   three weeks later on Slide 5 is the physician form that

22   Dr. Riegel submitted to Alere, and on this form it gave the two

23   options as to Allen's program.  They had a weekly option and a

24   two- to four-month option, and he checked the two- to

25   four-month option by hand.  And it said clearly on it that "To

1    remain on service with Alere, patients must test and report a

2    minimum of two times each month," and he certified to the

3    medical necessity of that test.  And what the form says is

4    that -- and Dr. Riegel signed it.  Even the form says that

5    Alere would not accept stamped signatures.  It required the

6    doctor to physically sign the form that was submitted, and it's

7    certified.  It says, "I certify that it is medically necessary

8    for the patient to self-test frequently in order to maintain a

9    stable INR, optimize its therapeutic effects, and avoid the

10   complications identified on Warfarin's product labeling.  I

11   further certify that the patient's medical record contains

12   supporting documentation to substantiate this medical need."

13   So that was what was submitted to Alere, and I concur with the

14   points earlier that Alere is legally entitled to rely on that

15   signed certification by the doctor.

16           So then --

17           THE COURT:  Why won't Alere do it once a month?

18           MR. KASSOF:  They had the same -- I mean, it's a

19   business decision that they made, which, I mean, it's not

20   alleged in the complaint, but Alere provides the monitor and

21   the strips, right, and then the meter that's at home, and then

22   the testing frequency is what ultimately pays for the meter.

23   So they made a business judgment to only allow patients into

24   the program who test frequently than more than once a month, so

25   either weekly or two to four --

1          THE COURT:  And the theory is, that eventually pays

2    off the meter?

3          MR. KASSOF:  It does pay off.  That's --

4          THE COURT:  And then do you have to give the meter

5    back?  Do you know?

6          MR. KASSOF:  I don't know.  I --

7          THE COURT:  You win it with enough strips?

8          MR. KASSOF:  I don't know -- what's that?

9          THE COURT:  You get to keep it with enough strips?

10         MR. KASSOF:  Well, we know that Mr. Allen, after he

11   was exited from the Roche program, he actually tested at home

12   with the meter and strips, he alleges, so I suppose he still

13   continued to use the meter and the strips post- --

14         THE COURT:  So you don't have to return it?

15         MR. KASSOF:  -- I don't know.  So, your Honor, at

16   Slide 6, all I did was put a comparison of the allegations with

17   Roche versus Alere just to frame it.  And with Roche, Dr. Riegel

18   ordered the weekly tests, so Roche lets him in the program.  He

19   then in July says Dr. Riegel and another physician signed on a

20   document that they submit to Roche that said, "We don't believe

21   it's medically necessary to test twice a week."  So Roche says

22   that "If it's not medically necessary, then you're out of our

23   program."  So contrast that with what happened with Alere.

24         So six months later Alere expressly told Mr. Allen

25   that "Our program requires twice a week.  It's going to be up

to your doctor."  They get a signed certification.  So

Dr. Riegel signed the certification and ordered the testing.

Now he says that, not even effectively, he says, "I lied.  That

wasn't true.  At the time I didn't believe it was medically

necessary.  Even though I told Alere, even though I knew it was

probably going to Medicare, I didn't believe it was medically

necessary for twice a week.  I only think it was medically

necessary for once a week."  He signed the certification

because he knew, I suspect, that if he said exactly what he

said to Roche, Alere would have said, "You're not allowed in

our program either."  So he signed the certification certifying

that it's medically necessary to get into the Alere program so

he could do the finger stick once a month, so Alere let him

into the program.

The fact that Mr. Allen's physician, Dr. Riegel, in

his medical judgment, for whatever the reason, chose to sign

that certification and tell Alere that "It's medically

necessary for my patient to get tested two to four times a

month," Alere has the absolute right to rely on that.  It

doesn't mean Alere submitted false claims.

THE COURT:  All right, can you just jump ahead.

MR. KASSOF:  Sure.

THE COURT:  Are there any alleged false statements

made by you in your marketing of materials?

MR. KASSOF:  No, your Honor.

 1              THE COURT:  All right.

 2              MR. KASSOF:  There's nothing in the complaint about

 3    it.

 4              THE COURT:  All right, now, what about the fact that

 5    they claim you billed for three -- that was the thing that was

 6    unique to your client, that they billed twice for three rather

 7    than the four.

 8              MR. KASSOF:  Exactly, because that's a coding --

 9              THE COURT:  The batch, the batch argument.

10              MR. KASSOF:  I describe that as kind of like a coding

11    claim theory versus this overarching false form claim.

12              THE COURT:  Yes.

13              MR. KASSOF:  So there are two claims that they

14    alleged, and just to put it into context, there literally are

15    only two claims at issue in this one.  So it is a claim

16    submitted on October 16, 2015, and a claim submitted on

17    December 2, 2016.  That's it.

18              THE COURT:  December 2, 2016?

19              MR. KASSOF:  December 2, 2016, yes.

20              THE COURT:  So a year later?

21              MR. KASSOF:  Yes, one in October 16 of '15, December 6

22    of '16, so 14 months later.  And we know that there's no

23    allegations that this was part of some massive scheme that

24    Alere was telling doctors --

25              THE COURT:  So you've now looked into it.  What

1    happened here?  You're saying, was it a clerical error?

2           MR. KASSOF:  No.  I mean, outside the complaint, I

3    can --

4           THE COURT:  Because I'm just saying, within the four

5    corners of the complaint, it was a false claim.

6           MR. KASSOF:  I don't believe it was.

7           THE COURT:  Why?  But I'm just trying to figure out

8    what to do with it because if it's a clerical error which was

9    fixed, you go down one path in discovery.  If it was a

10   practice, then you go down another path in discovery.

11          MR. KASSOF:  So, first off, just to put it clearly

12   into perspective, we're talking about $221 on two claims.

13          THE COURT:  I get it, but if you extrapolate and it

14   was happening a lot --

15          MR. KASSOF:  I don't think you can extrapolate, your

16   Honor --

17          THE COURT:  Why?

18          MR. KASSOF:  -- as the first point.  So they submitted

19   Exhibit 1 to their opposition to the motion to dismiss.  They

20   showed eight claims.  They did a year period from March of '16

21   through March of '17, and they had eight claims.  And they said

22   six of them were properly submitted after four tests.  These

23   were the two that were not.  So they've only identified two

24   claims.  I think under 9(b) and the other governing law, you

25   can't -- there's no scheme -- in fact their allegations because

1   of that submission, their allegations belie the theory that

2   this was sort of a routine practice.

3          THE COURT:  How long was he getting tested by you?

4          MR. KASSOF:  Well, he was entered into the program, so

5   at least two years, at least two years.

6          THE COURT:  So why wouldn't it make sense just to look

7   at the two years' worth of data and see whether this was just

8   an anomaly, inadvertent, not knowing, as opposed to just a

9   systemic -- I don't know what you'd call it -- accounting

10  practice, audit or some --

11         MR. KASSOF:  I'm going to get there in two seconds --

12         THE COURT:  Okay.

13         MR. KASSOF:  -- as to why it's not, but you can't do

14  that anyway, though, your Honor, because they could have put in

15  all of the claims.  They did it for '16.  They did it for '16.

16  They identified --

17         THE COURT:  Do they have all of the claims?

18         MR. KASSOF:  They went to Medicare.gov.  And this is

19  why I think the reason why the claim doesn't --

20         THE COURT:  I see.

21         MR. KASSOF:  They did two things.  They pieced

22  together two pieces of information.  They went on the Alere

23  website, and they gathered the tests that yielded numerical

24  values.  When the strip was submitted into the monitor, it

25  yielded what its INR was.  So they had the test dates that

1    yielded numerical values.  They then went to Medicare.gov, and

2    they pulled Mr. Allen's claims that were submitted by Alere for

3    this entire year period, okay?  And only two times over the

4    entire year did they say that Alere prematurely submitted

5    claims after three tests and not four.  All the other ones they

6    say were perfectly fine as far as how they were submitted.

7            THE COURT:  For one year?

8            MR. KASSOF:  For one year, yes.

9            THE COURT:  So two out of twelve.

10           MR. KASSOF:  And I'm going to explain those two in a

11   second, but there's no allegations that it was ever submitted

12   any other time.  They don't allege that it was because --

13           THE COURT:  And you're saying they had access to it?

14           MR. KASSOF:  They absolutely did, which they submitted

15   as Exhibit 1 to their opposition to the motion to dismiss.

16           THE COURT:  All two years?

17           MR. KASSOF:  They did one year.  They did March '16 to

18   March '17, but there's no reason why they couldn't go further

19   than that.

20           Anyway, the reason why I don't think it states a false

21   claim anyway, though, your Honor, is that they do not allege

22   that he had no other failed blood tests or when -- what he

23   alleges is that the tests on the strip yielded a numerical

24   value.  That's what they pulled off the website.

25           THE COURT:  I didn't understand what that meant when

1    you said it yielded -- don't they all?  I mean --

2          MR. KASSOF:  No, they don't.

3          THE COURT:  Why?

4          MR. KASSOF:  Because you can prick your finger, put it

5    on the strip, put it into the meter, and you've used the strip

6    in the meter, but it may not yield a numerical value.  It may

7    have been how the blood was placed on the strip, or for some

8    other reason, it didn't yield a number.  It doesn't tell us

9    what your INR is.

10          THE COURT:  Like a misfire, just it didn't --

11          MR. KASSOF:  Right.  It's deemed like a failed test.

12          THE COURT:  It's not just whether it's above or below

13    a certain limit?

14          MR. KASSOF:  Correct.  The patient, though, has

15    tested.  He's used one of his test strips into the meter, okay?

16    They don't allege that you can't count that as a test, as part

17    of the four that were submitted to Medicare.  And Mr. Allen

18    doesn't allege that he didn't have any failed tests during

19    those periods of time -- this is outside the complaint -- but

20    the truth is, is that he did.  We know that he did because he

21    submitted it to Alere.  But he can't allege, he cannot

22    allege --

23          THE COURT:  And you're allowed to submit a failed test

24    as one of your four?

25          MR. KASSOF:  Yes, and they do not allege that Medicare

1   will not pay for inclusion of a failed test.  They can't allege

2   that because that's not true.  They don't allege that.  And

3   they don't allege that he didn't have any failed tests during

4   that period of time.

5           THE COURT:  So why isn't this -- I have a problem with

6   it because under 9(b), they have met their obligation, who,

7   what, when, where, and why, unlike with most of these --

8           MR. KASSOF:  On those two.

9           THE COURT:  -- on those two, and the question is,

10  those are false claims.  I think there's no de minimis

11  requirement.  And you're saying is that if you look at it, it

12  wasn't false at all.  Don't I have to have something outside

13  the four corners of the record on it?

14          MR. KASSOF:  Well, so I think they only get those two.

15  Okay, they only get those two, and I don't --

16          THE COURT:  Well, they may get two years' worth of

17  discovery, though.

18          MR. KASSOF:  Well, to me, that's misusing 9(b) on that

19  because you then are saying:  Well, they've alleged two.

20  They've alleged that there are no other ones for that period of

21  a year, everything was properly submitted.

22          THE COURT:  For a year.

23          MR. KASSOF:  But then let them go find another year

24  and see if they can go get discovery on that, when they haven't

25  alleged anywhere any allegation suggesting that --

1          THE COURT:  Okay, I hear your position.  Thank you,

2     but we need to keep it going here, so --

3          So let me just jump to you.  Is it true -- let me just

4     get through one issue -- there are no allegations of false

5     marketing with respect to Alere?

6          MR. DeNINNO:  No.  Alere is another defendant who

7     used -- again, the complaint cites the Heneghan article as an

8     example.

9          THE COURT:  And where is it?

10          MR. DeNINNO:  It's on their website.  Again, the

11     complaint refers to it as marketing materials, but outside the

12     complaint, it's on their website, and it's used to support a

13     proposition that weekly self-testing has determined that timing

14     therapeutic range is increased.  In the Heneghan article, it

15     doesn't -- it's not even -- and this is explained in the

16     complaint -- it's not even possible to determine how frequently

17     the subjects of that study were testing because it was a

18     retrospective analysis of fourteen different studies.  I think

19     nine of them didn't require patients to disclose how

20     frequently --

21          THE COURT:  And with respect to the form, there was

22     nothing within the four corners of the form?  Was there

23     anything that you were challenging?

24          MR. DeNINNO:  As far as the --

25          THE COURT:  Alere.

1          MR. DeNINNO:  The enrollment form, your Honor?

2          THE COURT:  Yes.

3          MR. DeNINNO:  Okay.  No, I think the overarching point

4    with regard to the enrollment forms is that these enrollment

5    forms were used to implement the underlying false scheme, which

6    is that they're requiring doctors to order tests and they're

7    requiring patients to undergo tests at frequencies --

8          THE COURT:  But there's no false marketing information

9    in it?  The question is that they don't give you the option of

10   once a month?  That's what the challenge is?  I just want to

11   understand it.

12         MR. DeNINNO:  Yes, with regard to the forms.  I will

13   also say that the complaint does include other allegations of

14   false statements made by Alere.  Those false statements were

15   made by Alere's representative to Mr. Allen to attempt to

16   persuade Mr. Allen to participate in their home INR testing

17   program.  Specifically, it's attached to the complaint, the

18   email itself, and it's quoted in significant part in the

19   complaint that after Mr. Allen contacted Alere, a representative

20   named Mary Wages wrote back to Mr. Allen on January 13, 2015,

21   and said, "All the studies indicate that patients who have

22   tested more frequently have fewer adverse events."  And the

23   complaint goes through and cites several other more recent,

24   more authoritative studies which don't find that.  And so that

25   statement made by Ms. Wages to Mr. Allen in that email was

1  false, and it was made specifically to induce him to speak with

2  his doctor about participation in Alere's home testing program.

3           After Mr. Allen responded to Ms. Wages that he was

4  concerned that Medicare wouldn't cover testing that he hadn't

5  previously needed pursuant to his doctor's order, on

6  January 23, 2015, Ms. Wages responded, "Medicare will not

7  question frequency of testing," which again is not accurate.

8  And Mr. Allen went a step further with regard to Alere, and he

9  contacted the Medicare administrative contractor for

10  California, who confirmed in a written response to Mr. Allen,

11  which is also attached to the complaint, that Medicare does not

12  permit independent diagnostic testing facilities to order tests

13  on behalf of patients, and that they would question the tests

14  that were performed that weren't medically necessary.  So again

15  it's our position that that's another false statement made by

16  Ms. Wages in an attempt to induce Mr. Allen, the patient, to

17  speak with his physician about participation in their program.

18           THE COURT:  But did she ever speak to the physician?

19           MR. DeNINNO:  We don't allege that anybody from Alere

20  ever spoke directly to the physicians at Buffalo Cardiology,

21  but in a situation like this --

22           THE COURT:  It's like me listening to those ads every

23  night on TV, right?

24           MR. DeNINNO:  Well, they're intended to make you go

25  talk to your doctor about whether or not --

1          THE COURT:  Yes, they all are.  Maybe we could just

2    get all of them and go back to cereal ads.  I --

3          MR. DeNINNO:  Not when they're truthful, though, your

4    Honor.  I mean, truthful advertising is obviously permitted.

5    That's certainly not the allegation here.  It's the falsity of

6    the statements that she made with regard to what, you know,

7    Medicare --

8          THE COURT:  So the argument is, if you induce a

9    customer with false information and then he goes and asks for

10   it from his doctor, your argument is, that's a fraudulent

11   inducement?

12         MR. DeNINNO:  Well, it's a false statement that's

13   material to the submission of false claims.

14         THE COURT:  Maybe.  I mean, the doctor here seemed to

15   have pretty strong views about it, so I'm not sure.  At least

16   with Riegel, he seemed to know what he was doing.

17         MR. DeNINNO:  Well, again, the false statements are

18   specific examples that are indicative of the policies that

19   they're imposing on every patient.  I mean, these are specific

20   examples of false statements that were made.  And the complaint

21   alleges, again, that it's the underlying policy of requiring

22   patients to test their INR at a frequency that the defendants,

23   that Alere determined that violates the regulations and leads

24   to a false claim, and so --

25         THE COURT:  What about these strips; in other words,

1    whether there's three or four?  We may need more evidence about

2    it, but do you agree with what your brother says here, which is

3    that essentially you're allowed to bill for strips that fail?

4         MR. DeNINNO:  I don't agree with that, and I don't

5    agree that we don't allege that.  The billing code that they

6    have to use to submit these claims is HCPCS Code G0249, which

7    requires the IDTFs to provide services and supplies for four

8    tests and to actually report the results of those tests to the

9    physician.  And, again, this is a factual allegation that's not

10   included in the complaint --

11        THE COURT:  So I just want to understand.  So if you

12   have a failed test -- as he says, you know, there wasn't enough

13   blood, it was placed in the wrong spot, the equipment

14   malfunctioned, whatever -- there was a test, a strip was sent

15   in, and it got no numerical value, is there a regulation that

16   says what you're supposed to do about that?

17        MR. DeNINNO:  No, there's not.  And I think there

18   might be, and correct me if I'm wrong, but I think that what

19   Mr. Kassof said was that the strips are put into the machine at

20   home, and if the test does fail, it's up to the patient to call

21   that in to somebody to let them know it failed.  They're not

22   connected or they're not mailed.  There's a step where the

23   patient reports that, so --

24        THE COURT:  Well, how would he know if it just wasn't

25   enough blood, for example?

 1          MR. DeNINNO:  I think the machine -- my understanding

 2    is that the machine puts an error code rather than a result on

 3    its interface screen.

 4          THE COURT:  I'm just worried that this issue may need

 5    some discovery, but not a lot.

 6          MR. DeNINNO:  Well, your Honor, I also -- I wanted to

 7    correct one issue for the record.  The tests were not 14 months

 8    apart.  They were consecutive tests.  They were tests on

 9    October 16 of 2016, not 2015, and the very next test on

10    December 2 of 2016.

11          THE COURT:  All right, I see.  I see.  But that just

12    may have been a --

13          MR. DeNINNO:  Well, we allege, you know, in light of

14    all of the other underlying actions and conduct that are

15    contained in the complaint, that this is just another of

16    Alere's actions which are intended --

17          THE COURT:  Do you have the other year's worth of

18    billings?

19          MR. DeNINNO:  I don't have the other year's worth of

20    billings, and I'm not sure whether they're available.  The

21    exhibit that was attached to the complaint was provided because

22    apparently on Alere's website, they continued to report the

23    previous year's test results, and that happened to be what was

24    available at the time.

25          THE COURT:  So let's suppose I order them to produce

1   as part of automatic disclosure the two years' worth of data,

2   and these are the only two, and they also present evidence that

3   the fourth one was a failed test, does the claim go away on

4   summary judgment?

5         MR. DeNINNO:  Are you talking about just Mr. Allen,

6   your Honor?  I mean, they're obviously providing these tests to

7   tens of thousands of patients, and the allegation is that this

8   was --

9         THE COURT:  Well, but if they prove everything was

10   kosher, then there's no inference of a fraudulent scheme

11   because the one or two examples of a fraudulent claim that you

12   have, which if it turns out that it's not fraudulent, it

13   doesn't support an inference that it was broader.  If it turns

14   out it was, perhaps it does, so -- anyway, that's what I'm

15   thinking about.

16         MR. DeNINNO:  Well, I would also say with regard to

17   that, your Honor, the idea that -- we certainly don't agree

18   that a failed test can be counted as one of the four.  They

19   have to report actual results.

20         THE COURT:  I would just have to see the regs.  I'm

21   not going to jump into that here.

22         MR. DeNINNO:  Okay, I understand that, but --

23         THE COURT:  But it may not be fraudulent.  In other

24   words, it may be a misunderstanding of the reg if it's not

25   clear.  You say there's nothing clearly on point.

1          MR. DeNINNO:  No, the regulation says that the test

2     results have to be reported.  It's the billing code.  It's not

3     a regulation.  The billing codes are adopted by the CMS program

4     manual.  But that's where the direction comes that the IDPFs

5     have to actually perform and report.  And if they are, if as

6     has been suggested that they are --

7          THE COURT:  So you're saying the fourth, they should

8     just report this is failed?

9          MR. DeNINNO:  No, I think -- and I think that what

10    happens when you have a failed test is, you immediately use

11    another finger and do another test.  You still have to perform

12    the test.  You can't just not --

13         THE COURT:  Yes, just we're so far beyond the record,

14    I just don't know.

15         MR. DeNINNO:  And, right, and that's not what we

16    allege.  But if in fact that is what they're doing and they're

17    reporting failed tests as though they're one of the four tests,

18    then that actually would reveal a more widespread systematic

19    failure that would require more discovery to find out whether

20    or not that's something that's being done --

21         THE COURT:  I don't know, but I'll think about that

22    one.  I'll think about that one.  All right, thank you.

23         MR. DeNINNO:  Thank you.

24         THE COURT:  All right, so now the question is, we got

25    going around what time, 10:00, 10:15 or something?  What do we

1    want to do here?  We have two more or three more?

2           MR. KRAUS:  10:13 we started, your Honor.

3           THE COURT:  10:13?  Well, thank you.  Very good.  Do

4    you want to do one more and then we take a break?

5           MR. KRAUS:  I'm fine.  It's your call, your Honor.

6           THE COURT:  Why don't we have you go, and then we'll

7    take a break.

8              (Discussion off the record.)

9           MR. KRAUS:  Thank you, your Honor.  On behalf of

10   mdINR, and I won't repeat what's been said already.  The points

11   that I would make on behalf of mdINR are, there is no falsity.

12   Our enrollment form is explicit that we are for weekly testing

13   patients only.  So the complaint uses a lot of conclusory

14   labels like "no exercise of independent medical judgment" and

15   "coercion," but there is no coercion, and there is no lack of

16   independent medical judgment when we tell the physician exactly

17   the service that we provide and ask the physician if he or she

18   wants to prescribe that.  It's very straightforward.  It's

19   nothing misleading, no --

20          THE COURT:  Is there any false information being

21   alleged against you?

22          MR. KRAUS:  I think only to the extent that they

23   suggest one thing, that same study.  It's I think in

24   Paragraph 1...  There's a paragraph, and I'll get you the cite,

25   your Honor, but there's one paragraph where they say we use

 1    that same study.  I don't believe that a -- I think it's

 2    Paragraph 130.

 3            THE COURT:  Is it on your website?

 4            MR. KRAUS:  It's not alleged.  I don't believe it is,

 5    but it's not alleged, so I can't say for sure.

 6            THE COURT:  Do you have any information on the form

 7    that's being challenged?

 8            MR. KRAUS:  Yes, and it's explicit.  It says exactly

 9    what we do.  We say what we do, and we mean what we say.  It's

10    on --

11            THE COURT:  An elephant is faithful one hundred

12    percent?

13            MR. KRAUS:  That's where I was going.  Exhibit TT, and

14    it says explicitly, "I understand --" this is under the

15    statement, quote, "Statement of medical necessity and

16    prescription," and it goes through a number of different

17    statements but then ends, "I understand that mdINR's PT/INR

18    monitoring service is for weekly testing patients only."

19            THE COURT:  So, okay, thank you.

20            MR. KRAUS:  There you go.  So that's --

21            THE COURT:  It's almost like -- you're the first one

22    that there's no claim alleged.

23            MR. KRAUS:  No.  That's the other thing.  So there's

24    no falsity.  There's no 9(b).  This is not a difficult 9(b)

25    case at all.  If you apply what you did in *Verrinder*, it's out.

```
 1    It's not -- you don't even get access to the relaxed rule under
 2    Duxbury because this is not third-party submission, this is not
 3    indirect submission; it is direct submission alleged by mdINR;
 4    and they have zero physician, zero patient, zero claims.  It
 5    just doesn't state a claim.
 6            If you look at what the First Circuit just did in
 7    Nargol in 2017, Nargol says Karvelas is still the law of the
 8    circuit, just like you did in Verrinder, and it's a direct
 9    claim and there's no allegations.  Even, you know, I could talk
10    about other cases that they cite.  None of them get them to a
11    place where they can satisfy 9(b).  If you look at the Ge case,
12    the Ge case specifically says that the First Circuit is
13    doubtful that an "all claims," quote/unquote, theory without
14    providing any specifics would have passed 9(b).
15            THE COURT:  Thank you.
16            MR. KRAUS:  You're good?
17            THE COURT:  Yes, I'm good.
18            MR. KRAUS:  Public disclosure, we do think that
19    there's a public disclosure, and they're out on the public
20    disclosure bar.
21            THE COURT:  If I get there.  This is a hard one for
22    you because there are no claims.
23            MR. DeNINNO:  I'm sorry?
24            THE COURT:  There are no claims that you've alleged.
25            MR. DeNINNO:  Well, we allege that -- as he pointed
```

1  out, we allege that all of the claims were false.  Especially

2  with regard to mdINR, they require every patient who

3  participates in the program to test exactly weekly.  That's

4  exactly what's prohibited by 410.33(d), which --

5          THE COURT:  But only people who sign up and a doctor

6  says needed.  I mean, are you alleging any false information?

7          MR. DeNINNO:  They do cite the Heneghan study.  It's

8  again, like I said --

9          THE COURT:  It's on their website?

10          MR. DeNINNO:  It's on their website.  They cite it for

11  the proposition that self-testing may reduce adverse events,

12  which is again, as I explained in response to Roche,

13  specifically what was found to be insufficient by the authors

14  in 2012.

15          And, you know, your Honor, the other point is that

16  they are out there; they are offering these services to every

17  patient.  They're not limiting it to people who only require

18  weekly testing.  They --

19          THE COURT:  No, but it's to every patient who had a

20  doctor sign a form.

21          MR. DeNINNO:  Right, but they're not --

22          THE COURT:  You've got to get to the doctor somehow in

23  order to make this, you know, like a kickback, a fraud or

24  something.

25          MR. DeNINNO:  The doctors aren't being -- the signing

1   of the form can't be a valid order because the doctors don't

2   have any independent discretion.  This is exactly what the

3   Office of the Inspector General gets at with its guidelines,

4   which again were cited by the *Boston Heart* case as being

5   binding upon the laboratory.  If the OIG requires forms to be

6   developed in a way that promotes the conscious ordering of

7   every individual test by the physicians --

8           THE COURT:  I mean, I get your skepticism.  Suddenly

9   the 2008 Medicare regulation permits this expansion in funding,

10   and, whoops, they'll only provide weekly or biweekly or

11   nothing.  I understand that you believe they've put this

12   pressure on the doctors in order to afford the doctors'

13   patients some access that they didn't otherwise have.  I

14   understand that.  It's just a much harder claim than any

15   because there are no false claims for at least three of these

16   companies, four of these companies, none.

17           MR. DeNINNO:  I have to respectfully disagree.  Again,

18   your Honor, the allegation is that all the claims are

19   necessarily false when you don't allow a physician to make an

20   independent judgment.

21           THE COURT:  I'm just not going to accept that

22   argument.  I mean, have fun at the First Circuit.  Just you've

23   got to have something that shows that there was a connect to a

24   doctor that made them fraudulently prescribe, and I'm just not

25   sure one article on a website is enough, compared to what I've

1    seen before, which is so much more of a weighty set of

2    evidence.

3            MR. DeNINNO:  There is an additional false statement

4    with regard to mdINR.  Their representative, again, after being

5    contacted by Mr. Allen and Mr. Allen specifically asking

6    whether they would fill a prescription, as his doctor believed

7    was medically necessary for I believe once and sometimes twice

8    per month, on January 13, 2015, a Teresa Hoff Cimiluca

9    responded that he should be one hundred percent covered by our

10   service by Medicare, despite the fact that she had just been

11   informed that it wasn't medically necessary for him to undergo

12   testing any more than once, sometimes twice per month pursuant

13   to Dr. Riegel's instruction.

14           THE COURT:  All right, that's helpful.

15           MR. KRAUS:  Your Honor, if I might, if you look at the

16   statement that counsel just referred to, the statement says,

17   "We are weekly testing only.  Therefore, you and your physician

18   have to agree to weekly testing to use our service."  There's

19   nothing misleading about it.  It says exactly what the form

20   says.

21           THE COURT:  Well, and plus, right, "and you'll be

22   covered one hundred percent"?

23           MR. KRAUS:  If it's medically necessary and you test

24   within the criterias, then that will be covered.

25           THE COURT:  How many people do I have left?

```
1              MS. SHANAHAN:  Three of us, your Honor.

2              THE COURT:  Three of you.  Are they -- well, I think

3     we should take a ten- or fifteen-minute break, and then we'll

4     come back.  Okay, thank you.

5              THE CLERK:  All rise.

6              (A recess was taken, 11:21 a.m.)

7              (Resumed, 11:44 a.m.)

8              THE COURT:  Okay.

9              MS. SHANAHAN:  Good morning, your Honor.  Sara

10    Shanahan for Patient Home Monitoring.  PHM is similarly

11    situated to mdINR.  There are no false claims identified.

12    Patient Home Monitoring did not provide any services to

13    Mr. Allen, and there aren't any allegations in the complaint

14    that would point to any other patient or doctor tied to a

15    particular claim.

16              Similarly, we concur with the arguments that have been

17    made by the other defendants that there's no obligation for

18    Patient Home Monitoring to provide services beyond the niche

19    that it's designed its business to meet, which is weekly

20    testers.  And the --

21              THE COURT:  Do you know, does the person keep the

22    meter at the end in your company?

23              MS. SHANAHAN:  When it's done with the testing?

24              THE COURT:  Yes.

25              MS. SHANAHAN:  My understanding is that the meter is
```

1   given to the patient, and then the strips get re- --

2          THE COURT:  And when the testing necessity is over,

3   does it get returned?

4          MS. SHANAHAN:  I don't know the answer to that.

5          THE COURT:  No one seems to.  We couldn't figure that

6   out.

7          Is yours?

8          MR. PEARLSTEIN:  So I think the patient keeps it.  As

9   indicated here with Mr. Allen, he kept the Roche meter.

10         THE COURT:  So any alleged misleading marketing

11  information?

12         MS. SHANAHAN:  So there is the same allegation in

13  Paragraph 130 of the complaint that PHM somehow marketed the

14  2006 Heneghan article, but there aren't any additional

15  allegations related to who, what, when, where, how.

16         THE COURT:  Anything on your form other than the form

17  itself?

18         MS. SHANAHAN:  The form is very straightforward, your

19  Honor.  It specifically identifies weekly testing.  It

20  specifically identifies in the certification --

21         THE COURT:  But no representations as to the medical

22  necessity of it?

23         MS. SHANAHAN:  I mean, there's a specific

24  certification at the bottom that states that the doctor is

25  certifying that the testing is medically --

1          THE COURT:  But no alleged misrepresentations within

2     the body of the form?

3          MS. SHANAHAN:  I don't believe so, other than the

4     general argument that it should have been a blank instead of

5     identifying weekly testing.

6          THE COURT:  All right, thank you.  All right.

7          MR. DeNINNO:  Your Honor, with regard to Patient Home

8     Monitoring, their website -- and their website is linked in

9     their motion to dismiss, so I think it's appropriate to bring

10    up that their website does contain a citation again to that

11    2006 Heneghan article, again stating that patients capable of

12    self-monitoring could benefit from a one-third reduction in

13    death from all causes.  Again, we think that that is a

14    statement that -- in this particular case, I think that's a

15    statement that doesn't exist at all, even in the 2006 article,

16    just even taking out of the equation the fact that the authors

17    question their own previous conclusions later on, well before

18    this statement remained published on their website.

19         PHM, their complaint also includes a PowerPoint

20    presentation that PHM gave to its investors -- I believe it's

21    dated in 2010 -- in which they indicate that they're going to

22    set up their business as a business systemization --

23         THE COURT:  As a business?

24         MR. DeNINNO:  Business systemization for physicians

25    rather than a health benefit marketing of their services to

1  physicians.  This PowerPoint presentation suggests that

2  individual cardiology clinics might realize a benefit of

3  $250,000 per year if they refer their patients into the PHM

4  home monitoring program.

5          THE COURT:  How?  I didn't understand that.  Why would

6  it be a profit center for a doctor?

7          MR. DeNINNO:  Because the doctors get to bill -- it's

8  the very next HCPCS code, which is G0250 -- they get to bill

9  separately for interpreting the results.

10         THE COURT:  I see, because one would think that the

11  actual taking of blood at the clinic and then interpreting the

12  results would actually be more profitable.

13         MR. DeNINNO:  That's -- I don't think that's --

14         THE COURT:  No, I'm just --

15         MR. DeNINNO:  -- an unreasonable assertion.  That's

16  just what they represent.

17         THE COURT:  Like, we were trying to figure out why

18  does a hospital take blood intravenously, whereas you could do

19  a pinprick, and we were wondering whether that's because you

20  could charge more money for it, thinking that hospitals are not

21  immuned to this.  I would have thought that the clinic would

22  have preferred people coming in; they can charge for the nurse

23  and the taking of the blood and the reading.

24         MR. DeNINNO:  I don't know the answer to that

25  question, your Honor.  I know that --

```
1            THE COURT:  Anyway, I just assume everybody is
2     selfishly motivated, as long as it doesn't hurt the patient.
3     I'm not saying anyone wants to hurt a patient, but that they
4     try and get the one that's most profitable.  No, you don't
5     know.
6            Anyway, so that that's what you're relying on is the
7     investment PowerPoint.  Any evidence that that gets to a doctor
8     at all?
9            MR. DeNINNO:  Well, I mean, the admission that they
10    make in their presentation to investors is that this is how
11    they're going to market their services.  And, your Honor, I
12    think this also brings up a different point we didn't discuss
13    earlier this morning, which is that there is an obligation
14    under the Social Security Act to provide services economically.
15    It's Section 42 U.S.C. 1320c-G(a)(1).
16            THE COURT:  Good for you.
17            MR. DeNINNO:  I know, it's a mouthful.  Obviously I
18    had to write it down.  But there's precedent in this district
19    for applying that regulation to find that claims are false, or
20    at least not dismissed in a complaint alleging the claims are
21    false, when laboratories performing blood tests, incidentally,
22    developed protocols to maximize their profits.  That's the
23    Kneepkins v. Gambro Laboratories case.  And there's other
24    examples from outside the district as well.  There is the
25    Amedysis case which --
```

1          THE COURT:  Yes, but I can't -- first of all, you

2     didn't sort of allege it that way, that I remember anyway.

3     There's so much briefs on it.  But at the end of the day, in

4     terms of economically, they're saying they need to have at

5     least four to pay off the equipment.

6          MR. DeNINNO:  Well --

7          THE COURT:  So if I'm going to jump into the economics

8     of it, don't I have to know those kinds of things?

9          MR. DeNINNO:  Yeah, I mean, I certainly think that --

10     well, to know, obviously we'd need more information, and that's

11     a factual issue that's beyond the complaint.  I think that

12     answers its own question, which is that it shouldn't be a

13     grounds for dismissal at the --

14          THE COURT:  Did you allege that violation?

15          MR. DeNINNO:  We alleged throughout the complaint that

16     their policies were created to maximize their profits.  We

17     didn't specifically cite to that --

18          THE COURT:  To that statute.

19          MR. DeNINNO:  -- to that statute, but throughout the

20     complaint, it indicates that the defendants had profit

21     maximization rather than patient health, and especially in the

22     paragraph discussing this PHM --

23          THE COURT:  I'm assuming that's true, by the way, but

24     I'm not sure that's enough to be a False Claims Act violation.

25     It may be some other statutory violation, but you do have to do

1  something false.

2          MR. DeNINNO:  Well, the falsity is that they are

3  intentionally culling out patients who are less profitable, and

4  they're not disclosing this when they're submitting their

5  claims that they're only offering services to patients.  This

6  is one of these half-truths or critical omissions that the

7  Supreme Court found in *Escobar* that still can amount to a false

8  claim.

9          THE COURT:  With respect to PHM, I'm correct that you

10 don't know of any specific false claim, and you're claiming all

11 the claims are false?

12         MR. DeNINNO:  That's correct, your Honor.

13         THE COURT:  And that's true for the rest of them?

14         MR. DeNINNO:  Right.  Mr. Allen only actually

15 performed testing as part of the Roche and Alere testing

16 programs, but --

17         THE COURT:  That's right, and there's no other

18 information.  All right, thank you.

19         All right, next one.

20         MS. THORVALDSEN:  Good afternoon, your Honor.  Kara

21 Thorvaldsen.  I have two of the defendants, US Healthcare

22 Supply and also Advanced Cardio Services.

23         Like Patient Home Monitoring and like mdINR, there are

24 no specific claims at all alleged as to either of my clients.

25 Mr. Allen did not receive services either from US Healthcare or

1    from Advanced Cardio Services.  He never enrolled in their

2    programs and merely received some information from each of them

3    that he actually sought out.  There's no allegation that either

4    of my clients ever contacted any physician, whether it's

5    Mr. Allen's or anybody else in particular.

6            THE COURT:  Do you have this article on your website?

7            MS. THORVALDSEN:  Your Honor, according to --

8            THE COURT:  Websites, I should say, since you're

9    representing two companies.

10           MS. THORVALDSEN:  I do, and I'm sorry if addressing

11   them both together confuses things, but in Paragraph 130 of the

12   First Amended Complaint, my two clients, Advanced Cardio and US

13   Healthcare Supply, are the two defendants who actually are not

14   identified as having relied on and promoted this 2006 Heneghan

15   article, so my two clients specifically did not rely on that.

16           THE COURT:  And is there anything on your form that's

17   alleged to be false other than not giving them the option of

18   once a month?

19           MS. THORVALDSEN:  So with respect to US Healthcare

20   Supply, there's no enrollment form provided with the complaint

21   or alleged at all.  What's alleged with respect to US Healthcare

22   is that when Mr. Allen contacted that company, he advised them

23   that he would like to test on a monthly basis.  They advised

24   him that as an initial matter, they only accept weekly or

25   biweekly testers, and that unless his doctor ordered that

1  frequency, he wouldn't be eligible to enroll in their program.

2  That's sort of where that one was left.

3  　　　　With respect to Advanced Cardio Services, there is an

4  enrollment form.  Their enrollment form, which is attached to

5  the complaint as Exhibit JJ to the Allen affidavit, states

6  under "Prescription and Certificate of Medical Necessity," it

7  has a doctor certify that "It's medically necessary for this

8  patient to self-test weekly in order to maintain a stable INR

9  and avoid complications associated with Warfarin therapy."  And

10  it also states, "The patient's medical records support the

11  medical need for this service," and it certifies that

12  "Physician and patient understand that this service is for

13  weekly self-testing patients only."  So it's very clear, it's

14  very transparent, as with mdINR.

15  　　　　The one caveat that I would add to that, in candor, is

16  that in probably 5-point font under the test frequency

17  provision on the form, it says, "Medicare recommends weekly

18  testing."

19  　　　　THE COURT:  So that's false, right?

20  　　　　MS. THORVALDSEN:  Your Honor, I do not believe that

21  there is a specific recommendation from Medicare that weekly

22  testing is indicated, but I would submit that that on the form

23  is superfluous once the doctor has certified that weekly

24  testing is necessary for this particular patient, and that both

25  the patient and physician understand that this service is only

1    for weekly testing patients.  And, of course, your Honor,

2    there's no evidence of this particular form being used by, seen

3    by, or influencing any physician that used ACS's services.

4         THE COURT:  But in some ways yours presents the

5    hardest case because it's the one form that actually -- it's

6    not like something is on a website, and maybe a doctor saw it

7    or a doctor didn't see it.  That's the form the doctor has to

8    sign, right?

9         MS. THORVALDSEN:  That's correct.  This provides for

10   the physician to order the weekly testing.  But, again, the

11   form itself specifies that the physician has made the

12   determination that this particular patient that is being

13   enrolled requires weekly testing.

14        THE COURT:  That's the hardest one I've heard yet,

15   other than the strip thing, so --

16        MS. THORVALDSEN:  Again, your Honor, there is no claim

17   that any services were provided under this form.  The form was

18   provided to Mr. Allen in response to him reaching out to --

19        THE COURT:  Well, his claim is one of these

20   exceptions.  They claim that everything was induced basically.

21        MS. THORVALDSEN:  Correct, your Honor.  I think

22   plaintiff's theory as to Advanced Cardio Services would be that

23   every claim that was ever submitted by Advanced Cardio Services

24   for weekly INR testing, which would have been all of the

25   services that they ever provided, would have been false based

1   on this one statement in the enrollment form.

2          THE COURT:  Well, I don't know if I buy that, but is

3   it foreseeable that some are?

4          MS. THORVALDSEN:  Your Honor, I don't believe that's

5   the standard, and I think it would be implausible, given the

6   fact that, again, by the time the doctor is ordering the weekly

7   testing, the doctor has already made the determination that the

8   particular patient being enrolled requires weekly testing.

9          THE COURT:  Is that still on the form?

10         MS. THORVALDSEN:  I can't answer that, your Honor.  I

11  don't know.

12         THE COURT:  It shouldn't be.

13         MS. THORVALDSEN:  Duly noted, your Honor.

14         THE COURT:  Okay, all right, thank you.

15         MS. THORVALDSEN:  Thank you, your Honor.

16         MR. DeNINNO:  Your Honor, I think, you know, that's an

17  important point.  These forms, the way that the form was

18  communicated to Mr. Allen was that it was emailed to him after

19  he inquired about the Advanced Cardio Services.  This is the

20  form that they used, that they provided to all patients and to

21  all physicians in order to have them enrolled in their program;

22  and it contains, as I think we've just established, a false

23  statement that's necessarily associated with every claim that

24  they submitted.

25         THE COURT:  But the other ones, she's got the weakest

1  and the strongest case you've got because the other one doesn't

2  even reference the article, what's it, US Health.  It doesn't

3  reference the article, doesn't -- there's nothing.

4       MR. DeNINNO:  US Healthcare, I believe they don't

5  even -- I'm not sure they have a website that discusses this at

6  all, but --

7       THE COURT:  You don't have the enrollment form.  You

8  don't have anything false that was sent.  You have nothing.

9       MR. DeNINNO:  Oh, your Honor, for US Healthcare we do.

10  We have -- when Mr. Allen contacted US Healthcare, he again

11  disclosed that he needed testing pursuant to his physician's

12  order, which is weekly or biweekly, again, as we discussed

13  earlier, based on the Buffalo Cardiology algorithm and what his

14  previous tests had established; and a Kathryn Famularo

15  responded and said that he should be a hundred percent covered.

16  And then Ms. Famularo also told Mr. Allen that if he agreed to

17  test weekly for the first month, or however long it took them

18  to recoup the cost of the testing meter, that then they would

19  honor the prescription issued by his treating physician, which

20  again establishes that there's necessarily a false claim with

21  respect to every patient.  If they're requiring every patient

22  to test weekly until they make sure that each patient is

23  profitable, and then they start following doctors' orders,

24  those initial claims have to be false.  They're admitting that

25  they're taking away the doctor's ability to prescribe testing

1    pursuant to their independent judgment.

2              THE COURT:  Thank you.

3              MR. DeNINNO:  May I --

4              MR. GELB:  Your Honor, Richard Gelb --

5              THE COURT:  Did you have something else?  I'm sorry.

6              MR. DeNINNO:  I also wanted to say that Advanced

7    Cardio Services -- we kind of just skipped right over the US

8    Healthcare -- although there's not the statement on their

9    website, they do distribute a brochure to patients.  And this

10   is another document that's produced to Mr. Allen just based on

11   his initial inquiry, and the brochure contains basically the

12   same statement that the other websites have, which is,

13   "Medicare has determined that weekly testing compared to

14   traditional monthly lab tests can lead to fewer complications

15   associated with coumadin therapy," which, again, Medicare

16   hasn't made any such determinations.  The only --

17             THE COURT:  Who does that brochure get distributed to?

18             MR. DeNINNO:  In the amended complaint, it got

19   distributed to Mr. Allen as soon as he inquired about services,

20   and the allegation is that that's submitted to any patient or

21   any physician who inquires about services as part of --

22             THE COURT:  Thank you.  Thank you.  I'm sorry, I

23   jumped over that.  Mr. Gelb.

24             MR. GELB:  Thank you, your Honor.  Your Honor, with

25   respect to CardioLink, this is a situation, based on the

1   complaint, where the realtor (Sic) is trolling for cases.

2   There's no suggestion that he ever intended to use the

3   services --

4           THE COURT:  The relator?

5           MR. GELB:  Yes, the relator -- that he intended to use

6   the services and that he attempted to use the services.  The

7   form itself that he cites in the record has a field for

8   "other."  There's no allegation that if a doctor was coerced

9   not to fill in the field "other," there's no allegation that

10  any claim was submitted inconsistent with any doctor's

11  prescriptions.

12          In addition, the DVD that they refer to, there's no

13  allegation of the exact circumstances.  A DVD was never

14  delivered to Mr. Allen.

15          THE COURT:  Why are you talking about the DVD?

16          MR. GELB:  Well, he alleges that our client,

17  CardioLink, does not make face-to-face visits but rather uses a

18  DVD.

19          THE COURT:  To sell the product to the doctor?

20          MR. GELB:  Well, no.  To instruct on how to use the

21  product.

22          THE COURT:  How to use it.  And so what does it say on

23  it?  You know, you assume I know -- there are so many

24  defendants here and so many different allegations, I just want

25  you to remind me.  What is the false statement alleged in the

1   DVD?

2          MR. GELB:  There's no false statement alleged in the

3   DVD.  He's never even gotten a DVD.  I mean, I don't want to go

4   beyond the complaint, but in fact the DVD --

5          THE COURT:  So are there any alleged false statements

6   made by you?  You, your company, I mean?

7          MR. GELB:  No.  No, your Honor, there's no false

8   statements that are specified.  There's nothing to indicate

9   that doctors were influenced on decision-making.  There's no

10  marketing materials cited.  There's no actual documents that

11  would support a false statement or a false record.  It's just a

12  phone call for what they put in quotes in the complaint, "the

13  tech division of CardioLink."  There's no allegation of what

14  the tech division does.  There's no allegation of what

15  authority the person had to whom he spoke.  There's no

16  allegation that the person he spoke to had any knowledge about

17  claim submission.  There's no allegation that the person he

18  spoke to had any knowledge about training, and there's no

19  allegation that the person he spoke with would have any

20  authority to bind the company.

21         THE COURT:  But what did the person say allegedly?

22         MR. GELB:  Well, what is characterized is, he said

23  that they submit forms even if they don't do testing; that if

24  the doctor puts in for testing on a less frequent basis, they

25  still submit forms.

1          THE COURT:  False forms?  I'm not understanding.

2          MR. GELB:  In other words, what they're alleging is --

3          THE COURT:  That even if he's only tested once a

4     month, they'll put in claims for the other three weeks?  Is

5     that it?

6          MR. GELB:  Yes, but there's no evidence of that.

7          THE COURT:  I'm just trying to figure out what the

8     allegation is.

9          MR. GELB:  What it says is, "However, as Allen

10    discovered during his conversation with Sheffel --" that's the

11    individual from CardioLink -- "goes a step further than each of

12    the other defendants, IDTFs, at least explicitly, and submits

13    the maximum number of claims for reimbursement to Medicare per

14    patient regardless of whether the patient actually took the

15    test."

16          There's no reliable evidence to meet the standards of

17    9(b) and 12(b)(6).  The form itself has a provision for

18    "other."

19          THE COURT:  Okay, thank you.

20          So what was the claim against CardioLink?

21          MR. DeNINNO:  Your Honor, with regard to the DVD

22    issue, the national coverage determination that permits all of

23    the defendants to submit bills for home INR testing requires

24    that they assure that patients are provided face-to-face

25    training on the use of the testing meter before they're ever

1   eligible to submit any claim for reimbursement for testing.

2   When Mr. Allen contacted CardioLink, he was told that the

3   training would be provided by mailing him a DVD.  Mailing a DVD

4   obviously is not face-to-face training, and therefore the

5   allegation is that CardioLink was never eligible to submit any

6   claims for home INR testing because they never satisfied the

7   prerequisite that face-to-face training was provided to

8   patients.

9          THE COURT:  So this is a really different kind of

10  claim.  This isn't about false marketing or a coercive form.

11  This is about failure to give training face-to-face.

12          MR. DeNINNO:  Right, and that's a prerequisite to

13  submitting any claims at all.  That's one of the allegations

14  against CardioLink.  As he also discussed, when Mr. Allen

15  called, he was told by the CardioLink vice president of the

16  tech division, which is how he identified himself, that, first

17  of all, that CardioLink was required by Medicare to submit

18  tests at least every two weeks or at least twice a month, which

19  isn't true.  Medicare doesn't require bills to be submitted to

20  them at any frequency.  They allow bills to be submitted after

21  four tests are performed.  And then this vice president also

22  informed Mr. Allen that, because Mr. Allen inquired whether or

23  not he could continue testing at the frequency that his

24  physician prescribed, that he could test at whatever frequency

25  he wanted, but that CardioLink was going to continue submitting

1   bills pursuant to their schedule, which is as though Mr. Allen

2   was testing every week.

3          THE COURT:  Okay.

4          MR. GELB:  Your Honor, if I may?

5          THE COURT:  Yes.

6          MR. GELB:  We're confined to the complaint, so we

7   would dispute these allegations.  The point that I'm making is

8   that even if you accept it as true, there's no -- it's

9   speculative what actually occurred.  In other words, it's not a

10  situation where someone consumes services and did not get

11  training.  It's an isolated phone call with somebody that he

12  happened to interpret the conversation, but it's totally

13  speculative of --

14         THE COURT:  Well, it's not speculative.  It's what the

15  guy said, but the question -- the question I'm struggling with

16  is without even one claim.  I don't think the First Circuit

17  has -- it does have a more flexible standard, but without even

18  one claim, even assuming some fraudulent statements by an

19  employee or on the form, what do I do?  I mean, that's the

20  legal question.  I have to assume it's true that your person

21  said that they were doing something fraudulent.

22         MR. GELB:  Not fraudulent.

23         THE COURT:  Well, it's what he says he's going to do,

24  is that "Regardless of the test, I'm going to submit the

25  claim."  That's fraudulent, right?

1          MR. GELB:  Yeah, but if the form says "other," then

2    the only way the claim can be false is if the doctor's form was

3    altered, and there's no allegation that that occurred.  There's

4    no allegation that --

5          THE COURT:  I understand that, and that's why that's

6    the very narrow legal question I need to answer.  Either

7    whether it's because of the form was bad for cardio services or

8    your employee said something bad, does that case go forward

9    without even one claim?

10          MR. GELB:  The form is distinguished from the others

11    because --

12          THE COURT:  You're not hearing me.

13          MR. GELB:  I'm sorry.

14          THE COURT:  At least if you took what that employee

15    said as true, "It doesn't matter what you fill in on the form,

16    we're going to submit for claims, for multiple claims," you

17    know, per month, the four, then that's fraudulent; but I don't

18    have any evidence that it actually happened.  And the First

19    Circuit has been pretty rough on saying you've got to have some

20    sense that there was at least one claim that was fraudulent,

21    and that's what I'm struggling about.

22          MR. GELB:  And, your Honor, if I may, I think the case

23    law also says that the complaint should not be a vehicle to

24    find evidence to meet the standards of 9(b).

25          THE COURT:  I understand that, but I -- I understand

1    that.  So what is the big case you're relying on to say even if

2    there's not one claim that's allegedly fraudulent?

3        MR. DeNINNO:  Well, your Honor, there are a number of

4    cases in this circuit that have found that in situations where

5    the underlying conduct necessarily results in falsity in the

6    claims submitted to the government, that it's not necessary to

7    plead specific false claims.

8        THE COURT:  I understand that.  I actually had one of

9    these yesterday where it just seems immediately foreseeable,

10   but here it's just really one big step removed from that.  I

11   mean, here's some -- so I'm struggling with that, I have to

12   tell you.  Is there a case where there's no claim, false claim

13   at all?

14       MR. DeNINNO:  Sure, your Honor.  I believe that the

15   *United States ex rel Hutcheson v. Blackstone* is --

16       THE COURT:  *Hutcheson* is what you're relying on,

17   because I know there's some that have tried to be more

18   flexible, but it's only if you know for a fact --

19       MR. DeNINNO:  Well, I agree, but that is what we

20   allege with regard to these underlying policies that mandate

21   the tests to be performed at the frequency --

22       THE COURT:  Can I tell you what the problem is?  I

23   don't think I accept your core, if I haven't been clear, your

24   core tenet that, you know, just because they're requiring at

25   least bimonthly, that in and of itself is a False Claims

1   violation.  I think, as long as you have a doctor signing off

2   on it who hasn't been induced by false information, that that's

3   not a False Claims Act violation.

4       However, I've now got an example of one false form

5   with false information in it.  Now, is that an example of

6   perhaps an admission that regardless of what you put there, we

7   charge for the four?  And then I have the slips issue, the

8   three or four, where you've got a specific instance of a

9   potential false claim, as opposed to this overarching thing,

10  like, you're forcing doctors into this tough choice.

11      MR. DeNINNO:  Well, your Honor, in those situations,

12  again, the *Hutcheson* case, I think there are some other --

13  there are other cases.

14      THE COURT:  Okay, I'll look.  All right, so this is --

15      Yes, Mr. Gelb?

16      MR. GELB:  I don't think there's enough in the

17  complaint to conclude that that was an admission.  It could be

18  a statement that was made, but the corporation, it only admits

19  something if the person who says it has authority to bind the

20  company, and that's not alleged.

21      MR. DeNINNO:  Your Honor, it doesn't have to be an

22  admission.  These were presented as company -- the face-to-face

23  training was presented as the policy of the company to send a

24  DVD rather than provide face-to-face training.

25      THE COURT:  All right, all right, all right, this is

1   what I'm going to do:  As I mentioned, the overarching theory I

2   don't think I'm going to accept.  There are alternative

3   theories, some of which might fly, but all discovery is stayed

4   except as to the Alere with these three or four.

5          MR. KASSOF:  Two.

6          THE COURT:  Two.  No, no, no, whether or not you

7   submit for three strips or four strips, and only allowed with

8   respect to Mr. Allen's bills for the two years and what

9   happened.  And then if I find that there's a fraud, then I'll

10  deal with whether or not it should be extrapolated, as opposed

11  to a good-faith disagreement about what a regulation provides

12  or even just a misimpression that you might have.  So I think

13  that can be done pretty quickly.  You can probably get him his

14  billing information in how long?

15         MR. KASSOF:  We can do, as per this, your Honor,

16  within three weeks maybe?  Because for sure we can do -- on the

17  two claims, we can give exactly why it is that we submitted

18  it --

19         THE COURT:  No, but just this whole billing issue,

20  it's only two years, how long would it take?

21         MR. KASSOF:  Three or four weeks.

22         THE COURT:  So he can get the other year.  And if

23  there were a bunch of them, then you might have a problem.  If

24  there weren't a bunch of them, maybe -- well, if there are a

25  bunch of them, maybe there's a -- my law clerk actually looked

1   up the regulation, and it's not so clear actually -- maybe you

2   agree with that, I don't know -- on what you're supposed to do

3   if there's a bad test result.  It may be an ambiguity in the

4   regulation, do you report it or not?  I'll just have to make

5   whatever decision I make, but I think that's a very narrow

6   range of discovery that can happen while I write this opinion.

7   But otherwise I'm going to just have to take this under

8   advisement, and I don't think it's likely I'm going to accept

9   the overarching theory.

10          Also, my preliminary impression, which I don't intend

11  to be held to, but it's just having something on the website --

12  I may look -- it's probably going to be down by the time I get

13  into my chambers -- but, anyway, just having an old study on a

14  website without direct ties to the doctor --

15          MR. DeNINNO:  Your Honor, if I may --

16          THE COURT:  I'm going to assume it's the website.  I

17  know you just said marketing material.  I'm going to assume

18  it's what you just said.

19          MR. DeNINNO:  Well, to the extent, there is additional

20  detail.  The complaint pleads that as an example.  It cites

21  numerous other studies.  We would request the opportunity to

22  amend and provide additional --

23          THE COURT:  Not right now you're not.  We're going to

24  rule it, and then I'll deal with what we're dealing with.  This

25  has been briefed to death.  So I will take sort of the putative

amendment about the website, but I'm not sure that gets to the

doctor is the thing.  The only thing that's getting directly to

the doctor is the thing on the form, that one company they had

on the form.

MR. DeNINNO:  Well, your Honor, as long as we're

discussing the websites, and I'm not going to be able to

identify specifically which defendants have which websites, but

the majority, maybe all, of the defendants have specific

subsections of their websites that are directly targeted to

physicians.

THE COURT:  It's too late now.  It's just too late.

It's too late.  We just went through the argument.  It's 12:15.

I've just spent two and a half hours with you.  I'm not going

to start it up again.  But, in any event, it's all under

advisement except for the two years' worth of submitted claims

with respect to Mr. Allen.

MR. DeNINNO:  Your Honor, just one more.

MR. KASSOF:  We'll do the two years as well, but we'll

also, your Honor, provide the failed test information that we

do have for the two claims that he's identified.

THE COURT:  Thank you.

MR. DeNINNO:  Your Honor, I just wanted to reiterate

one more time, since we're talking about getting to the doctor,

we do plead that Roche did contact, make direct contact to

Buffalo Cardiology to induce Buffalo Cardiology to change their

1    patients over to the weekly testing.  That's beyond just the

2    website marketing materials.

3         THE COURT:  But then they didn't.

4         MR. DeNINNO:  No.  The complaint and Dr. Riegel's

5    affidavit says that he did start signing them for other

6    patients in addition to Mr. Allen that had previously been

7    testing pursuant to the Buffalo Cardiology --

8         THE COURT:  I thought with Allen, he said he doesn't

9    need it, so they stopped.

10        MR. DeNINNO:  But the complaint also -- my only point,

11   your Honor, is that we also allege that Roche contacted him

12   directly and had all of the patients who were previously tested

13   pursuant to their algorithm, which the algorithm is attached as

14   an exhibit; and if they had tested pursuant to the algorithm

15   and they had tests that were previously in range, then they

16   would be directed, pursuant to the algorithm, to test in a

17   month, not in two weeks, as Roche started requiring.

18        THE COURT:  Right, right.

19        MR. DeNINNO:  So those are specific --

20        THE COURT:  So there's no evidence that the clinic

21   switched anyone.

22        MR. DeNINNO:  But Dr. Riegel said that he signed, in

23   addition to Allen, that he signed Roche's new prescription

24   slips with regard to other patients.

25        THE COURT:  But he signed them.  Anyway, I get the

1   point.  All right, thank you.

2           MR. PEARLSTEIN:  Thank you, your Honor.

3           THE COURT:  All right, thank you.

4           THE CLERK:  All rise.

5           (Adjourned, 12:18 p.m.)

1                    C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )

5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8   do hereby certify that the foregoing transcript, Pages 1

9   through 79 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in Civil Action No. 16-11372-PBS,

11  United States of America, et al v. James F. Allen, et al, and

12  thereafter by me reduced to typewriting and is a true and

13  accurate record of the proceedings.

14         Dated this 7th day of May, 2018.

15

16

17

18

19         /s/ Lee A. Marzilli

20         _____
           LEE A. MARZILLI, CRR
           OFFICIAL COURT REPORTER

21

22

23

24

25