```
_____
                                 )
UNITED STATES OF AMERICA ex rel. )
JAMES F. ALLEN,                  )
                                 )
               Plaintiff,        )
                                 )            Civil Action
          v.                     )          No. 16-11372-PBS
                                 )
ALERE HOME MONITORING, INC., ROCHE )
HEALTH SOLUTIONS, INC., ADVANCED )
CARDIO SERVICES, CARDIOLINK CORP., )
MDINR, LLC, PATIENT HOME          )
MONITORING, INC., TAMBRA          )
INVESTMENTS, INC., and U.S.       )
HEALTHCARE SUPPLY, LLC,           )
                                 )
               Defendants.        )
_____)
```

**MEMORANDUM AND ORDER**

January 7, 2019

Saris, C.J.

**INTRODUCTION**

This is a False Claims Act ("FCA") case involving Medicare reimbursements for at-home blood-testing kits for patients receiving blood-thinning treatment. In August 2018, the Court issued a memorandum and order dismissing the claims against several Defendants, while permitting claims against three Defendants to go forward. See generally United States ex rel. Allen v. Alere Home Monitoring, Inc., 334 F. Supp. 3d 349 (D.

Mass. 2018). What follows assumes familiarity with that decision.

Prior to issuing the decision, the Court had twice stayed proceedings against Defendant Tambra Investments ("Tambra") pending settlement discussions. The most recent stay expired before the Court issued its decision. But the Court's decision did not address the claims against Tambra in light of the prior stays and the parties' representations that they were attempting to settle the matter.

Now before the Court is a motion by Relator James Allen to enforce a purported settlement agreement, filed two days after the Court issued its decision. Relator claims that Tambra and he reached an enforceable settlement agreement prior to the Court's opinion. Tambra counters that no such agreement existed because its consent was contingent on the government agreeing to release Tambra's corporate officers from liability -- a proposal the government ultimately rejected. Without an enforceable settlement agreement, Tambra asks the Court to rule on its motion to dismiss.

For the reasons that follow, the Court agrees with Tambra that the parties never reached a meeting of the minds on the scope of the release from the government that Tambra sought. Because this was a material term of the contemplated settlement,

they did not reach an enforceable agreement. Thus, the motion to enforce (Dkt. No. 154) is **DENIED**.

On the merits, Tambra's motion to dismiss (Dkt. No. 101) is **ALLOWED**.

**FACTUAL BACKGROUND**

The material facts are drawn from written communications between the parties submitted in connection with the motion to enforce a settlement. They are not subject to genuine dispute. Facts relating to the underlying litigation are set forth in more detail in the Court's prior opinion. See <u>Allen</u>, 334 F. Supp. 3d at 352-54.

## I. <u>Initial Settlement Offer</u>

Relator made his initial settlement offer to Tambra in a February 2018 letter, which proposes that Relator obtain a monetary payment, and that Tambra agree to allow the blood testing at issue in the case to be done at the frequency independently chosen by a prescribing physician. Dkt. No. 155-1 at 3. In exchange, Tambra would receive a "<u>release of all claims of the United States related to conduct</u> alleged by the Amended Complaint through the date of the settlement agreement." <u>Id.</u> (emphasis added).

The letter contains a full paragraph describing the importance of government approval to the settlement process. Relator stated that "the United States remains the real party in

3

interest in this action, and any proposed settlement will require the consent of the Department of Justice." Id. at 2. The letter later reiterated that the settlement proposal "is necessarily contingent upon approval from the Department of Justice." Id.

The attorneys for Relator and Tambra continued to negotiate the terms of a possible monetary payment into March and April 2018. In a March 2018 email, Tambra's counsel proposed a monetary payment in exchange for "a broad mutual release" and the dismissal of the case against Tambra with prejudice. Dkt. No. 198-1 at 13. Relator's attorney said these terms were "generally fine (subject, as always, to the government's blessing)." Id. In a subsequent March 2018 settlement offer, Tambra's counsel again stated, "Naturally there must be a full release and dismissal with prejudice." Id. at 12.

## II. **The Stay**

In April 2018, the parties jointly asked the Court for a stay. Dkt. No. 128. Tambra's counsel wrote, "I agree with the idea of staying as to [Tambra] so we can close on settlement." Dkt. No. 155-2 at 3. At this juncture, Relator's counsel remained cognizant of the fact that the parties would still need "to get [the settlement agreement] by the government." Id. This understanding was also reflected in the motion for a stay. Dkt. No. 128 ¶¶ 2-6. The motion stated, "Allen and [Tambra] agree

4

that, if for some reason, the government objects to the settlement and the settlement cannot be effectuated, the stay may be lifted, and the case against [Tambra] will proceed . . . ." Id. ¶ 8. The Court allowed the motion. Dkt. No. 136.

### III. **Government's Involvement**

In April and May 2018, the federal government became involved in the settlement talks. See Dkt. No. 168-4 at 1; Dkt. No. 198-1 at 5. The parties agreed to begin drafting a settlement agreement using a government template. Dkt. No. 198-1 at 5. The government later provided Tambra's counsel with a first draft of a proposed settlement agreement, cautioning that the settlement "remain[ed] currently under consideration by the United States." Dkt. No. 168-4 at 1.

In June 2018, the government "approved the settlement parameters." Dkt. No. 155-3 at 2. The agreement still lacked "[f]inal approval" from the Department of Justice ("DOJ") and the United States Attorney's Office, but such approval could come only after Relator and Tambra finalized the draft from their end. Id.

Around the same time, the parties' initial 60-day stay expired. They sought, and received, a second stay on June 4, 2018. Dkt. Nos. 151, 152.

In July 2018, settlement discussions faltered. On July 3, 2018, counsel for Tambra sent a redline draft of the settlement agreement to the assistant United States attorney working on the case. Dkt. No. 168-5 at 2. In the email accompanying the draft, Tambra's attorney stated that his "primary concern relate[d] to the scope of the release." Id.

> Individual officers, directors, and employees, acting in their respective corporate capacities, need to be included in the scope of the release. I can't have a world where the company is dismissed and released, and then one week later, the officers, directors, and employees are sued for the exact same thing. Need to include everyone.

Id. Counsel for Relator was copied on this email. Id.

About an hour later, the government's attorney responded (again copying Relator's counsel), stating that "many" of Tambra's proposed edits remained "very problematic" for the government. Dkt. No. 168-6 at 2.

On July 5, 2018, the government's attorney sent a new draft. Dkt. No. 168-7 at 2. Despite the government's prior email, this version accepted Tambra's proposed release for officers and directors. Id. However, the government's email again concluded with the caveat that DOJ would still need to review and accept the draft agreement. Id. Relator's attorney, who was copied on this email, approved the new draft. Id. at 3.

On July 6, 2018, the government's attorney retracted his acceptance of the release. Dkt. No. 168-9 at 2. He informed the

parties that releasing the individual officers or directors would violate a DOJ policy instituted in a 2015 memorandum by former Deputy Attorney General Sally Yates. Id. He proposed different release language that did not apply to individual officers or directors. Id.

As of July 10, 2018, Tambra still had not given a thumbs up or thumbs down to this new release language. Dkt. No. 168-10 at 2. The government's lawyer advised that if Tambra did not assent to the more limited release, a settlement between Relator and Tambra could still go forward. Id. But if that happened, the United States would dismiss the claims against Tambra only "without prejudice," meaning the government could refile the claims. Id.

On July 13, 2018, Relator's lawyer sent a text message to Tambra's lawyer to check in about the government's most recent draft of the agreement. Dkt. No. 168-11 at 2. Tambra's lawyer responded with his position:

> The entire value [of the settlement] was for [the] owners and employees to have peace of mind from the feds. We aren't getting that anymore. Not leaving a loophole open for a double dip opportunity at them. . . . Paying [redacted] for barely any release is not what I bargained for. I'm not pushing them to agree to this, unless [the] settlement amount drops or unless [the] scope of release expands.

Id. He later reiterated that, for his client, the main value of the proposed settlement was obtaining a personal

release for the owners, officers, and employees of Tambra, as well as saved litigation expenses. Id. at 3.

It is undisputed that Tambra never accepted the government's July 6 or July 10 proposals.

## DISCUSSION

## I.   Was There an Enforceable Settlement Agreement?

### A.   Parties' Arguments

Relator argues that settlement negotiations occurred on two tracks: one involving him and Tambra, the other involving the federal government and Tambra. Relator asserts that he and Tambra had agreed to all material terms of a settlement, independent of any negotiations Tambra had with the government. He argues that the only outstanding contingency as to his agreement with Tambra -- approval of the release by the "upper echelons" of the federal government -- is not enough to render the agreement unenforceable.

Tambra contends there was only one contemplated settlement agreement, and it involved all three entities (Relator, Tambra, and the government). In its view, the parties never agreed on the language of the government's release, which was a material term. Specifically, Tambra wanted the government to broadly release its officers from personal liability and dismiss all claims with prejudice. Tambra states it did not agree to a settlement that did not include these terms. It insists that any

such agreement would have been substantially less valuable to the company than its monetary offers up to that point.

## B.    Legal Standards

### 1.    Substantive Contract Law

A party to a settlement agreement may seek to enforce the agreement's terms by filing a motion with the trial court. <u>Fid. & Guar. Ins. Co. v. Star Equip. Corp.</u>, 541 F.3d 1, 5 (1st Cir. 2008). Where, as here, the underlying cause of action is federal, a motion to enforce a settlement agreement generally "is determined in accordance with federal law." <u>Malave v. Carney Hosp.</u>, 170 F.3d 217, 220 (1st Cir. 1999).[1] "The relevant federal

---

[1]    There is room for debate over whether federal common law or Massachusetts law governs the contract issue in this case. Federal common law applies in a case that involves "the rights and obligations of the United States." <u>Tex. Indus., Inc. v. Radcliff Materials, Inc.</u>, 451 U.S. 630, 641 (1981). Because the United States is the real party in interest in a qui tam action like this one, it is likely that federal common law governs. On the other hand, Relator seeks to enforce a settlement that, according to him, involved only two private parties -- Relator and Tambra.

In any event, the Court need not resolve this question because here Massachusetts law is similar to federal common law:

> It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement. It is not required that all terms of the agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract. The parties must, however, have progressed beyond the stage of "imperfect negotiation."

<u>Situation Mgmt. Sys., Inc. v. Malouf, Inc.</u>, 724 N.E.2d 699, 703 (Mass. 2000) (citations omitted) (quoting <u>Lafayette Place Assocs. v. Bos. Redevelopment Auth.</u>, 694 N.E.2d 820, 826 (Mass. 1998)).

substantive law includes the common-sense canons of contract interpretation derived from state law . . . ." Morais v. Cent. Beverage Corp. Union Emps.' Supplemental Ret. Plan, 167 F.3d 709, 712 (1st Cir. 1999) (quotation marks omitted). Here, that means that the party seeking to enforce an agreement bears the burden of "proving the existence of a contract." Moore v. La-Z-Boy, Inc., 639 F. Supp. 2d 136, 140 (D. Mass. 2009) (applying Massachusetts law).

Typically, matters of contract interpretation turn on the intent of the parties. See McCarthy v. Azure, 22 F.3d 351, 362 (1st Cir. 1994). "Parties do not become contractually bound until they mutually assent to bind themselves to an agreement. Courts determine that mutual assent, not on the basis of what goes on inside the parties' heads, but rather on the basis of what they say and do." Salem Laundry Co. v. New Eng. Teamsters & Trucking Indus. Pension Fund, 829 F.2d 278, 280 (1st Cir. 1987) (citation omitted) (citing 1 Williston on Contracts § 18, at 32 (3d ed. 1954)); see also Mathewson Corp. v. Allied Marine Indus., Inc., 827 F.2d 850, 853 (1st Cir. 1987) (describing the "established principle that 'contracts depend on objective manifestations of consent and not on uncommunicated subjective expectations" (quoting Bushkin Assocs., Inc. v. Raytheon Co., 815 F.2d 142, 146 (1st Cir. 1987))).

Even when the parties to an agreement contemplate a written document, there can still be an enforceable agreement before the document is executed. See Quint v. A.E. Staley Mfg. Co., 246 F.3d 11, 15 (1st Cir. 2001). On the other hand, "[p]arties can agree on every term in a contract, yet not be bound until they sign a written agreement, if they so indicate." Salem Laundry, 829 F.2d at 280.

2. Standard

"The trial court may summarily enforce [a settlement] agreement, provided that there is no genuinely disputed question of material fact regarding the existence or terms of that agreement." Fid. & Guar. Ins. Co., 541 F.3d at 5. In other words, where "the material facts are not in dispute, it is up to the court to determine whether a binding agreement has been reached." D'Agostino v. Fed. Ins. Co., 969 F. Supp. 2d 116, 126 (D. Mass. 2013) (applying Massachusetts law); see also Moore, 639 F. Supp. 2d at 140 ("Whether a purported contract contains the necessary elements for enforceability is (ordinarily) a question of law reserved for the court."). But "[w]hen a genuinely disputed question of material fact does exist, the court should hold a hearing and resolve the contested factual issues." Fid. & Guar. Ins. Co., 541 F.3d at 5.

## C.   Analysis

Here, the material facts are all contained in the written communications supplied by the parties. These facts are not subject to genuine dispute. Therefore, the only question is whether these communications show a meeting of the minds on the material terms of a settlement agreement. The Court concludes that they do not.

The parties' communications demonstrate they never agreed on the scope of the release that Tambra sought. There is no evidence that the parties, at any point throughout their talks, specifically negotiated the scope of the release. Tambra initially sought a "release of all claims of the United States related to the conduct alleged by the Amended Complaint." Dkt. No. 155-1 at 3. Later, Tambra's counsel described "a broad mutual release," with the case against Tambra being dismissed with prejudice. Dkt. No. 198-1 at 13. He subsequently mentioned "a full release and dismissal with prejudice." Id. at 12. Relator's counsel generally agreed, but the record shows no additional detail regarding the nature of the release, who would benefit from it, or who (the Relator, the government, or both) would be doing the releasing. Additional detail came only later, in July 2018, when Relator's attorney expressly approved of a draft agreement that included a government release of Tambra's individual officers. Dkt. No. 168-7 at 3. But of course, the

government, despite initially accepting this term, swiftly
reneged.

When the United States ultimately refused to release
Tambra's officers from "all claims," the record demonstrates
that the three parties to the settlement negotiations had not
and could not mutually agree to the scope of the release.
Because the release was a material term, there was no
enforceable agreement. This was simply not a circumstance where
the parties had "agreed upon all material terms," such that the
purpose of a final executed document was "to serve as a polished
memorandum of an already binding contract." Goren v. Royal Invs.
Inc., 516 N.E.2d 173, 175 (Mass. App. Ct. 1987). As a result,
Relator's reliance on Fecteau Benefits Group., Inc. v. Knox, 890
N.E.2d 138, 145–46 (Mass. App. Ct. 2008), is inapt.

Alternatively, Relator argues that there were two separate
settlement agreements in play: one between Relator and Tambra,
and one between the government and Tambra. Again, the undisputed
facts do not support this argument.

In July 2018, the government rejected Tambra's proposal for
a release of its individual officers and offered a suggestion:
that Tambra and Relator could proceed with an agreement between
themselves, not involving a government release. Dkt. No. 168-10
at 2. The government would "remove itself as a signatory" from
such an agreement, which would necessarily "eliminate any

13

release from the [United States]." Id. Not surprisingly, Tambra
never accepted this proposal.

A text-message exchange between the attorneys for Relator
and Tambra followed shortly after the government's rejection of
Tambra's release language. Tambra's attorney stated in no
uncertain terms that the primary value of a settlement for his
clients was "to have peace of mind from the feds," and it would
make little sense to pay the proposed amount "for barely any
release." Dkt. No. 168-11 at 2. Moreover, when the parties first
began drafting an agreement, they used a government template.
Dkt. No. 198-1 at 5. And later, it was the government's attorney
who circulated a draft of a single agreement. Dkt. No. 168-4 at
1.

Whether one agreement or two, the undisputed evidence shows
that the parties reasonably expected the government to be the
lynchpin in the settlement process -- which makes sense in a qui
tam action[2] because the FCA statute requires the Attorney General
to "give written consent" to a relator's dismissal of an FCA
action. 31 U.S.C. § 3730(b)(1). Given this underlying statutory
scheme, it is not unreasonable that Tambra wanted a full release

---

[2]     "Qui tam is short for the Latin phrase qui tam pro domino rege
quam pro se ipso in hac parte sequitur, which means 'who pursues this
action on our Lord the King's behalf as well as his own.'" Vt. Agency
of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765, 768 n.1
(2000). Thus, in a case like this, "[i]t is clearly established that
. . . the Government remains the real party in interest." Minotti v.
Lensink, 895 F.2d 100, 104 (2d Cir. 1990).

from the government. And there are no communications in the record indicating otherwise.

To cinch matters, the cases that Relator cites in his favor are inapposite. He cites United States v. Northeast Medical Services, Inc., Civ. No. 12-2895, 2016 WL 627417, at *2 (N.D. Cal. Feb. 17, 2016). However, this decision was ultimately reversed by the Ninth Circuit, which declined to enforce a settlement agreement because "the administrative remedies condition precedent was not satisfied." N.E. Med. Servs., Inc. v. Cal. Dep't of Health Care Servs., 710 F. App'x 737, 739 (9th Cir. 2017).

Relator next cites United States ex rel. Osheroff v. MCCI Group Holdings, LLC, Civ. No. 10-24486, 2013 WL 3991964, at *1, *5-6 (S.D. Fla. Aug. 2, 2013), where the relator and the defendant agreed to the essential terms of a settlement agreement in a written "memo of understanding," and told the Court they had reached "full settlement" and would seek dismissal upon consent of the government. The government objected to certain terms, which the Court deemed "little more than boilerplate." Id. at *7.

Here, Tambra objectively manifested its position that a full release from the government for Tambra's individual officers was a condition precedent to the company's desire to settle. And unlike in Osheroff, the parties here never arrived

at a memorandum of understanding and they never agreed on the scope of government release. Relator correctly argues that the law does not require the government to be a party to the settlement agreement. See Osheroff, 2013 WL 3991964, at *6 (describing how 31 U.S.C. § 3730(b)(1) requires the government to consent to "dismissal, not that it must consent to the parties' settlement in order for a binding agreement to result"). But Tambra's written communications objectively manifested to Relator that the company was treating the government's release as central to the settlement.

For these reasons, the undisputed facts do not show a meeting of the minds on the essential terms of a settlement agreement. Relator and Tambra simply never reached terms on an enforceable settlement agreement. Relator's motion to enforce the purported agreement is denied.

## II. **Do the Claims Against Tambra Survive a Motion to Dismiss?**

### A.  **Recap of the Prior Decision**

As explained in more detail in the prior decision, the allegations in this case pertain to Medicare reimbursements for at-home blood-testing kits. Allen, 334 F. Supp. 3d at 352. The kits allow patients on blood-thinning medication to monitor their blood's clotting time at home rather than traveling to a hospital or clinic. Id. Defendants supply these kits to patients and get reimbursed through Medicare. Id. However, Defendants

only provide kits to patients who test two to four times per month. Id. According to Relator, this business practice of requiring two to four monthly tests as a precondition to providing kits induces doctors to order medically unnecessary tests because, in many instances, patients only require one test per month. Id. Seeking Medicare reimbursement for medically unnecessary tests violates the FCA. Id.

In broad strokes, the prior decision rejected Relator's claims that relied solely on the enrollment forms of a Defendant who never actually provided supplies to Relator. See id. at 356-59. The Court held that such allegations were insufficient to satisfy Rule 9(b) of the Federal Rules of Civil Procedure because Relator offered no way of distinguishing, based on the enrollment forms alone, between medically unnecessary tests and necessary ones. See id. Certain claims were permitted to go forward -- for instance, if the Defendant had actually provided services to Relator or if Relator's allegations advanced a more specific theory of fraud. See id. at 359-66.

### B. Parties' Arguments

Tambra initially sought dismissal because it never provided any services to Relator, never contacted his doctor, never provided any medically unnecessary services, and never misled any doctor into doing so. Following the Court's rulings as to the other Defendants in this case, Tambra now also argues that

it is similarly situated to companies like Patient Home Monitoring ("PHM"), U.S. Healthcare Supply, and mdINR, against whom the Court dismissed the claims.

Relator presses three arguments in response: (1) that three of Tambra's enrollment forms evince a scheme to coerce and mislead physicians and patients into ordering medically unnecessary tests, (2) that Tambra is not similar to the dismissed Defendants, and (3) that Tambra's main enrollment form usurped physicians' independent medical judgment with respect to testing frequency. For the reasons discussed below, these arguments are unavailing.

### C.    Legal Standard

In analyzing whether a complaint has stated a claim sufficient to satisfy Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must set aside any statements that are merely conclusory and examine the factual allegations to determine if there exists a plausible claim upon which relief may be granted. Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 75 (1st Cir. 2014). The Court must draw reasonable inferences in the pleader's favor. Id.

Because FCA claims sound in fraud, Rule 9(b) of the Federal Rules of Civil Procedure requires relators to allege their claims with particularity -- that is, with the "who, what, when, where, and how of the alleged fraud." Hagerty ex rel. United

States v. Cyberonics, Inc., 844 F.3d 26, 31 (1st Cir. 2016)

(quoting United States ex rel. Ge v. Takeda Pharm. Co., 737 F.3d

116, 123 (1st Cir. 2013)). That said, the First Circuit has

"repeatedly emphasized that there is no 'checklist of mandatory

requirements' that each allegation in a complaint must meet to

satisfy Rule 9(b)." Id. (quoting United States ex rel.

Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 233 (1st Cir.

2004)).

**D. Analysis**

1. Tambra's Three Enrollment Forms

Relator's first argument is based on three Tambra

enrollment forms. One provides a single test-frequency option

("Weekly"), followed by the notation, "Medicare will cover up to

52 tests per year." Dkt. No. 206-2 at 3. Another provides a

different test-frequency option: "As ordered by Beaumont

[Anticoagulation Management Services]." Dkt. No. 206-1 at 2. A

third provides two test-frequency options: "Weekly" and "Bi-

Weekly." Dkt. No. 206-2 at 2. According to Relator, this third

form is offered only to patients referred to Tambra by

University of Michigan Anticoagulation Services. Relator asserts

that these latter two forms belie Tambra's previous claim that

it offers only weekly testing and support his theory that the

"weekly only" form is part of "a ruse" to trick doctors and

patients into ordering unnecessary tests. Tambra contends that

it advised Relator that he was not a candidate for weekly testing services and asked Relator to stop contacting the company.

Relator's argument starts off on the wrong vein by asking the Court to consider two additional enrollment forms (the Beaumont and University of Michigan forms) that were not mentioned in the operative complaint. See Amend. Compl. ¶ 242 (depicting the first enrollment form, but not the other two). As stated in the prior opinion, the Court cannot consider documents outside of the pleadings without converting this into a motion for summary judgment. See Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir. 2008).

But even if the Court were to consider the additional forms, Relator's argument would fail. One of Relator's theories that survived in the prior opinion alleged that the enrollment form of Advanced Cardio Services ("ACS") included the false statement, "Medicare recommends weekly testing." Allen, 334 F. Supp. 3d at 360. Because it was reasonable to infer that a doctor would rely on this allegedly false statement in ordering tests, the claim satisfied Rule 9(b) and Rule 12(b)(6). Id.

Unlike the ACS form, Tambra's forms contain no false statements. Relator does not allege, for instance, that Medicare does not cover up to 52 tests per year. Instead, the forms permit a prescribing physician to exercise her independent

medical judgment in deciding whether to order the tests at the frequency options provided. The fact that Tambra offers different testing options to patients from different facilities is not, on its own, indicative of fraud. And Relator does not explain how these forms would otherwise support a strong inference of fraud. This theory of liability fails.

### 2. Tambra and the Dismissed Defendants

In the prior opinion, the Court separated the Defendants into two categories: those who actually provided tests to Relator, and those who did not. See Allen, 334 F. Supp. 3d at 356. The allegations in the complaint put Tambra into the latter category, as Relator never enrolled in Tambra's home-testing program, and Tambra never provided Relator with any testing kits. See Amend. Compl. ¶¶ 230-42.

This categorization leaves Relator facing an uphill battle because it is difficult, based on an enrollment form alone, to satisfy Rules 9(b) and 12(b)(6). See Allen, 334 F. Supp. 3d at 356-59. As the Court stated in its prior opinion, "Relator offers no categorical way of putting a Defendant on notice of which enrollment forms, if any, resulted in false claims because a physician signed off on more testing than needed." Id. at 358. So too with Tambra. In essence, "Relator has not provided enough additional evidence to strengthen the inference of fraud beyond

the level of possibility based on the enrollment forms alone."
Id. at 358-59.

It is true that the Court permitted specific claims against three Defendants (Cardiolink, ACS, and Alere) to survive dismissal. But in each instance, Relator had alleged additional facts that strengthened the inference of fraud: an allegedly improper DVD training program for Cardiolink; an allegedly false statement on the enrollment form for ACS; and familiarity with Relator's medical history, coupled with actually providing him with unnecessary testing materials, for Alere. See id. at 359-60, 363-66. The complaint alleges no similar facts with respect to Tambra.

The complaint also includes Tambra in its test-reporting theory, which alleges that the Defendants violated the FCA by giving physicians the option of receiving their patients' test results only if they were out of range and/or on a monthly summary basis. Allen, 334 F. Supp. 3d at 366. As before, this theory fails with respect to Tambra because Relator has not alleged a specific instance of a physician selecting a reporting option and because the test-reporting requirements of the relevant billing code are ambiguous. See id. Insofar as Relator asserts common law claims against Tambra, they too fail because Relator does not have standing to raise such claims on behalf of the United States. See id. at 366-67.

### 3. Usurping Medical Judgment

All that remains is Relator's argument that Tambra's enrollment forms usurp physicians' independent medical judgment with respect to testing frequency. Again, this theory bleeds into an argument the Court rejected in its prior decision. See Allen, 334 F. Supp. 3d at 359 (concluding that enrollment forms, standing alone, "[did] not permit one to distinguish between a claim that involved genuine medical judgment and a claim that was medically unnecessary" and therefore did not give rise to a "strong inference" that they resulted in false claims being submitted). The same reasoning and conclusion apply here.

#### ORDER

For the reasons given, the motion to enforce a settlement agreement (Dkt. No. 154) is **DENIED**. Tambra's motion to dismiss (Dkt. No. 101) is **ALLOWED**.

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge